G. D. HOYLE v. CITY OF CHARLOTTE, A MUNICIPAL CORPORATION

No. 18

(Filed 11 February 1970)

1. Aviation § 4;    Estates § 1——    ownership of property —— rights in airspace

In adjudicating the relative property rights in the airspace, the courts generally have found it necessary to modify the ancient maxim of real property, "he who owns the soil owns it to the heavens," so that the general rule now deducible from the authorities is that the justiciable right

to the exclusive possession of land extends upward only to that point necessary for the full use and enjoyment of the land and the incidents of its ownership, the balance being regarded as open and navigable airspace.

**2. Aviation § 1— landing and taking off — municipal airport — authority of FAA**

The Federal Aviation Agency has, and exercises, full responsibility for the actual operations that cause planes to land and take off at a municipal airport, including the use of runways and the manner of approach and departure. 49 U.S.C.A. § 1101 *et seq.*

**3. Aviation § 1— airports — state law — federal regulations**

Chapter 63 of the General Statutes, entitled "Aeronautics," contemplates full cooperation and compliance with federal statutes and rules and regulations of appropriate federal agencies.

**4. Aviation § 1— municipal airport — grant of use — approach areas**

A grant, by lease or otherwise, of the right to use a municipal airport includes the right to use the approach areas necessary to land and take off in the manner prescribed by the Federal Aviation Agency.

**5. Aviation § 4; Eminent Domain § 2— municipal airport — overflights — private property — "taking" — inverse condemnation**

If overflights in taking off from and landing on municipal airport in accordance with the rules and regulations of the Federal Aviation Agency constitute a direct and immediate interference with the enjoyment and use of a plaintiff's property to such extent as to impair substantially the fair market value thereof, such overflights constitute a "taking" by the municipality of an air easement as appurtenant to the operation of its airport, notwithstanding municipality failed to initiate easement condemnation proceedings pursuant to G.S. 63-5.

**6. Eminent Domain § 1— taking by inverse condemnation — landowner's remedy**

When private property is taken for a public purpose by a municipality or other agency having the power of eminent domain under circumstances such that no procedure provided by statute affords an applicable or adequate remedy, the owner, in the exercise of his constitutional rights, may maintain an action to obtain just compensation therefor.

**7. Aviation § 1; Eminent Domain § 4— municipal airport — flight easement — power of condemnation**

Municipal airport, by the exercise of the power of eminent domain conferred by G.S. 63-5, had authority to condemn an easement of flight over all of landowner's property for all type aircraft at minimum altitudes of 79, 80 or 90 feet above the surface of the ground and higher.

**8. Aviation § 4— inverse condemnation of airspace — flight easement — municipal airport — sufficiency of evidence**

In landowner's action to recover compensation for alleged inverse condemnation by a municipality, incident to its ownership and operation of an airport, of a flight easement through the airspace over plaintiff's property above an elevation of 90 feet, landowner's evidence *is held* sufficient

to permit a jury finding that, beginning in January or February 1962 and occurring continuously thereafter, the recurring noise, vibrations, air pollution, and air currents from frequent overflights by commercial jets at altitudes ranging from 80 feet to 500 feet substantially and adversely affected the reasonable market value of his property, thereby constituting a "taking" by the municipality of a flight easement over landowner's property and entitling landowner to compensation therefor.

**9. Trial § 26; Pleadings § 36— variance between pleading and proof**

Variances between pleading and proof do not require nonsuit where there is no indication that defendant was misled or otherwise prejudiced.

**10. Aviation § 4; Eminent Domain § 13— municipal airport — condemnation of flight easement — time of "taking" — compensation — instructions**

Where landowner's evidence was to the effect that defendant municipality appropriated a flight easement over his airspace beginning in January or February 1962 with the frequent and regular overflights of commercial jet aircraft at low altitudes when taking off and landing on a runway of the municipal airport, and that municipality has since then used the easement and will continue to do so, the flight easement effectively vested in the municipality as of January or February 1962, and the amount of landowner's compensation must be determined as of that date; consequently, trial court erred in instructing the jury that compensation was determinable with reference to the market value of landowner's property at the time of the trial in December 1968.

**11. Aviation § 4; Eminent Domain § 13— inverse condemnation — airspace — time of taking — pleadings**

In an action to recover compensation for the inverse condemnation of airspace over the landowner's property, the landowner should allege with reasonable specificity when the alleged appropriation or taking occurred and the lower and upper altitudes of the airspace above his property to which the easement relates.

**12. Limitation of Actions § 5— trespass to realty — three-year limitation**

The three-year statute of limitations is applicable to an action for trespass upon real property. G.S. 1-52(3)..

**13. Aviation § 4; Limitation of Actions § 4— inverse condemnation — flight easement — accrual of action**

Landowner's cause of action for inverse condemnation against a municipality for the taking of a flight easement over landowner's property accrued in January or February 1962, with the beginning of frequent and regular overflights of commercial jet aircraft at low altitudes; and the cause of action, instituted in 1967, was not barred by statute of limitations.

**14. Aviation § 4; Eminent Domain § 5— "taking" of airspace — amount of compensation**

The compensation to which a landowner is entitled for the inverse condemnation of a flight easement through his airspace is the difference in the

value of his property immediately before and immediately after the "taking" by a municipal airport of the flight easement.

**15. Eminent Domain § 5— inverse condemnation — time of compensation**

A plaintiff cannot, by deferring the institution of his action for inverse condemnation, select a later date for the determination of the compensation to which he is entitled.

MOORE, J., did not participate in the consideration or decision of this case.

APPEAL by defendant from *Ervin, J.,* December 9, 1968 Civil Session of MECKLENBURG Superior Court, certified pursuant to G.S. 7A-31 for review by the Supreme Court before determination by the Court of Appeals, docketed and argued as No. 10 at Fall Term 1969.

This action was instituted September 21, 1967, to recover compensation in the amount of $47,500.00 for the alleged inverse condemnation by defendant, incident to its ownership and operation of Douglas Municipal Airport (Airport), of a flight easement of the airspace over plaintiff's property above an elevation of 90 feet.

Plaintiff owns a 4.8-acre tract of land located roughly seven-tenths of a mile (3,695.29 feet) northeast of the northeast end of the northeast-southwest runway of Douglas Municipal Airport. Plaintiff acquired this tract by two purchases, the first in 1928 and the second in 1944. The buildings thereon consist of the dwelling where plaintiff resides and a duplex which he rents.

The Airport is owned and operated by defendant. Its construction in 1936 and 1937 was financed jointly by a grant of the Works Progress Administration of the United States and the proceeds of a bond issue approved by the voters of defendant. Operations commenced on June 1, 1937.

As originally designed and laid out by defendant, the Airport consisted of a north-south runway, an east-west runway and a northeast-southwest runway. The northeast end of the northeast-southwest runway is the same distance from plaintiff's property now as it was in 1937. The original length of the northeast-southwest runway was 3,500 feet. It has been twice extended to the southwest. In the fiscal year 1939-1940, its length was increased to 5,000 feet; in 1952-1953, to 7,503 feet. The center line of the northeast-southwest runway, if extended northeast from the northeast end thereof, would bisect plaintiff's property, passing between plaintiff's residence and his garage.

Beginning in 1937, there have been uninterrupted flights of planes over plaintiff's property.

As a basis for his general allegation that defendant "ha(d) taken an air easement over the property of the plaintiff for an altitude ranging between 90 and 300 feet above the ground over the entire area" of his property, plaintiff alleged, *inter alia,* the following: (1) Defendant "is now and has for some time past caused large numbers of aircraft both civilian and military to take off and land on said airport at all times of the day and night." (2) Defendant "is and for some time past has been causing and directing numerous and ever-increasing flights of aircraft of all types over the entire area of the plaintiff's above-described property at elevations ranging from 90 feet to 300 feet above the ground." (3) "(S)uch flights will continue to increase in number and will fly even lower than at present when larger jet planes are introduced and used at the Douglas Municipal Airport." (4) "(A)ll of the plaintiff's property . . . is . . . located in the 100-decibel zone with sound intensity so great as created by the noise and vibration from jet aircraft and other aircraft flying over said property at the dangerously low altitudes hereinabove-mentioned that it is unbearable to a normal human being and has rendered the plaintiff's property unsaleable and almost unliveable by the plaintiff himself in spite of his having conditioned himself to the noise and vibrations . . ."

Answering, defendant denied it had taken a flight easement over the plaintiff's property, and denied that the flights of airplanes over plaintiff's property had affected adversely the fair market value thereof.

Defendant, as further answers and defenses, alleged the following: (1) It "ha(d) nothing to do with the landing and taking off of aircraft from Douglas Municipal Airport, excepting to provide the runways and the physical facilities," the operation of aircraft to and from the Airport being entirely in the hands of and under the control and direction of the Federal Aviation Agency and the owners and operators of the various planes which land and take off at said Airport. (2) ". . . the Federal Government and the State Government have preempted the air space above the plaintiff's property and have made and constituted it a part of the public domain, and the public has the right to use said space for air travel without any duty to compensate the plaintiff for such use." (3) Any invasion of the airspace over plaintiff's property by aircraft was "inconsequential" and insufficient to constitute a taking of plaintiff's property. (4) Plaintiff's action is barred by the 20-year (G.S. 1-40), the 10-year (G.S. 1-56), and the 3-year (G.S. 1-52) statutes of limitation.

Evidence was offered by plaintiff and by defendant. The evi-

dence, in addition to testimony and documentary evidence, includes "Stipulations" and attached exhibits.

Evidence offered by plaintiff includes evidence tending to show the following: During World War II, the United States leased the Airport from defendant and there operated a military base known as Morris Field Airbase. The lease, according to its terms, was to expire on June 30, 1966. Hostilities having ended in 1945, the lease was cancelled May 13, 1946, upon terms set forth in a quitclaim deed and agreement then executed. Thereupon defendant resumed the operation of the Airport. During the period the Airport was operated as Morris Field Airbase, many jet propelled military planes flew over plaintiff's property. In 1967 and 1968, Globemasters made flights over plaintiff's property. The Globemaster, also known as C-124, is a four-motor propeller type aircraft, "the largest propeller driven transport that the Air Force or military has."

Evidence offered by defendant includes evidence tending to show the following: Beginning at the end of 1953 and continuing into 1961, many F-86 fighter jets and T-33 jet trainers, operated by the Air National Guard, flew over plaintiff's property. In 1962 and thereafter, the Air National Guard "had no jets." On and after February 1, 1967, the Air National Guard, from time to time, operated Globemasters over plaintiff's property.

Commercial airlines first commenced operating jet aircraft at the Airport in January or February, 1962. Prior thereto, flights by *commercial airlines* were by propeller-type aircraft.

On direct examination, plaintiff testified: "In my opinion the frequency of commercial jet aircraft flights first became so substantial as to materially affect, adversely affect, the market value of my property in 1962. The flights first began adversely affecting the then market value of my property shortly after they began flying commercial jet flights over it as a continuous thing, increasing the planes. By shortly after, I mean within a year's time." On cross-examination, plaintiff testified: "I did not consider my property was devalued or that I was inconvenienced by the flights of planes over my property until 1962 or 1963." A witness for plaintiff, whose property adjoins that of plaintiff, testified: "I would think my property would have been suitable for industrial use prior to 1962. If the jets were not flying out there today, my property would be an ideal place for a motel."

Plaintiff's evidence also tended to show that, during the period from January or February, 1962, until the trial at December 9,

1968 Session, the frequent and regular overflights of commercial jet aircraft at low altitudes, when taking off from and landing on the Airport's northeast-southwest runway, constituted a direct and immediate interference with the enjoyment and use of his property to such extent as to impair the reasonable market value thereof.

Plaintiff's property, although zoned as industrial property prior to and since 1962, has been and is being used by plaintiff and his tenants for residential purposes.

On direct examination, plaintiff was asked this question: "Mr. Hoyle, do you have an opinion satisfactory to yourself as to the fair market value of your property at the present time free from jet aircraft and other type aircraft flying over it regularly and repeatedly at altitudes ranging from ninety feet above the ground upward to 500 feet above the ground?" Over defendant's objections, plaintiff was permitted to answer he had such opinion, namely, "$52,500."

Thereupon, this question was asked: "Mr. Hoyle, do you have an opinion satisfactory to yourself as to the fair market value of your property in its present condition subject to the over-flight of jet aircraft and other type aircraft at regular and repeated intervals at elevations ranging from ninety feet upward to 500 feet in the manner that you have described them here to the jury?" Over defendant's objections, plaintiff was permitted to testify that he had such opinion, namely, "$6,000."

Witnesses Luna, Broyles and Waggoner were permitted, over objections by defendant, to give their opinions in answer to substantially the same questions. In Luna's opinion, the difference was $43,-500.00 ($48,300.00 v. $4,800.00). In the opinion of Broyles, the difference was $43,500.00 ($48,000.00 v. $4,500.00). In Waggoner's opinion, the difference was $53,500.00 ($59,500.00 v. $6,000.00).

Other evidential matters will be discussed in the opinion.

The jury returned the following verdict:

"1. Has the Defendant, City of Charlotte, taken a flight easement over the plaintiff's property, as alleged in the complaint? ANSWER: Yes.

"2. What amount of compensation, if any, is the plaintiff entitled to recover of the City of Charlotte as the result of the taking of such flight easement? ANSWER: $16,800."

After preliminary recitals, in which the verdict was quoted, the court entered the following judgment:

"NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND

DECREED that the plaintiff have and recover of the defendant the sum of $16,800.00 as full compensation for the taking of the flight easement over the plaintiff's property as hereinafter described, AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED that upon payment of this judgment the defendant shall hereafter have an easement of flight in perpetuity over all of the property of the plaintiff described in the complaint in this action for all type aircraft at minimum altitudes of seventy-nine feet above the surface of the ground and higher;

"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that upon payment of this judgment, together with the costs of this action by the defendant, that the plaintiff will execute a deed conveying to the defendant such an easement;

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant pay the costs of this action to be taxed by the Clerk."

Defendant excepted and appealed.

*Carswell & Justice, by James F. Justice and C. J. Leonard, Jr., for plaintiff appellee.*

*Ervin, Horack & McCartha, by Paul R. Ervin and William E. Underwood, Jr., for defendant appellant.*

BOBBITT, C.J.

[1] "In keeping with the expansion and development of air navigation and commerce, but recognizing the dominant right of the surface owner to fully use and enjoy his land, the courts, generally, in adjudicating the relative property rights in the airspace, have found it necessary to modify the ancient maxim of real property, 'he who owns the soil owns it to the heavens.' The general rule now deducible from the authorities is that the justiciable right to the exclusive possession of land extends upward only to that point necessary for the full use and enjoyment of the land and the incidents of its ownership, the balance being regarded as open and navigable airspace. Stated affirmatively, a landowner has a dominant right of occupancy for purposes incident to his use and enjoyment of the surface, superior to any claimed rights of aerial navigators which conflict therewith." 8 Am. Jur. 2d, Aviation § 3.

Pursuant to authority conferred by Congress, 49 U.S.C.A. § 1341 and § 1348, the administrator of the Federal Aviation Agency has prescribed regulations which, in pertinent part, provide: "Ex-

cept when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes: (a) . . . (b) . . . (c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure. (d) . . ." The Code of Federal Regulations, Title 14 — Aeronautics and Space — Part 60 to 199 (Revised as of January 1, 1969) § 91.79. In a non-congested area, airspace to an altitude of 500 feet or more is deemed within the public domain. Under the federal statutes and regulations, the airspace over plaintiff's property to an altitude of 500 feet is not a part of the public domain. *United States v. Causby,* 328 U.S. 256, 90 L. ed. 1206, 66 S. Ct. 1062 (1946).

We consider now the facts pertinent to defendant's contention that its ownership of the airport should not subject it to liability to plaintiff.

[2] The Federal Aviation Agency, 49 U.S.C.A. § 1101 *et seq.,* has, and exercises, full responsibility for the actual operations that cause planes to land and take off at the Airport. The runways to be used and the manner of approach and departure are determined and prescribed by employees of the Federal Government. Development of the Airport, including the extension of the northeast-southwest runway, was in conformity with plans approved by the Federal Aviation Agency. Overflights of which plaintiff complains were and are made in accordance with regulations prescribed by the Federal Aviation Agency.

Upon the cancellation on May 13, 1946, of the lease of the Airport to the United States Government for use as Morris Field Airbase, defendant entered into certain contractual obligations with the United States with reference to defendant's operation of the Airport. To qualify for assistance in making improvements at the Airport in conformity with the National Airport Plan, defendant was required to make "Sponsor's Assurances" which provide, *inter alia,* (1) that the Airport "shall be used for public airport purposes on reasonable terms and without unjust discrimination," and (2) that the United States, as specifically provided, "shall at all times have the right to use the airport in common with others." Commercial airlines, under the terms of their leases from defendant, are granted the right to use the Airport for enumerated specific purposes, including "landing" and "taking off" of their aircraft.

Defendant pays all costs of maintaining the Airport. Its income

consists of landing fees, gasoline and oil sales, hangar and terminal facility rentals, income from concessions, maintenance services, etc.

In *Griggs v. Allegheny County,* 369 U.S. 84, 7 L. ed. 2d 585, 82 S. Ct. 531 (1962), reh. den., 369 U.S. 857, 8 L. ed. 2d 16, 82 S. Ct. 931 (1962), the Greater Pittsburgh Airport, owned and operated by Allegheny County, was involved. The opinion of Mr. Justice Douglas states: "The airport was designed for public use in conformity with the rules and regulations of the Civil Aeronautics Administration within the scope of the National Airport Plan provided for in 49 U.S.C. §§ 1101 et seq." Again: "The airlines that use the airport are lessees of respondent; and the leases give them, among other things, the right 'to land' and 'take off.' No flights were in violation of the regulations of C.A.A.; nor were any flights lower than necessary for a safe landing or take-off. The planes taking off from the northeast runway observed regular flight patterns ranging from 30 feet to 300 feet over petitioner's residence; and on let-down they were within 53 feet to 153 feet." It was held, in accordance with *United States v. Causby, supra,* that there had been *a taking* of an easement *by Allegheny County* for which Griggs was entitled to compensation. The basis of the dissent of Mr. Justice Black, with whom Mr. Justice Frankfurter concurred, is that the United States of America rather than Allegheny County should pay for an easement necessary for the landing and taking off of aircraft in accordance with federal statutory provisions and rules and regulations of federal agencies.

In *Griggs,* Mr. Justice Douglas summarizes pertinent portions of the National Airport Plan provided for in 49 U.S.C.A. §§ 1101, *et seq.,* as follows:

"By this Act the federal Administrator is authorized and directed to prepare and continually revise a 'national plan for the development of public airports.' § 1102(a). For this purpose he is authorized to make grants to 'sponsors' for airport development. §§ 1103, 1104. Provision is made for apportionment of grants for this purpose among the States. § 1105. The applications for projects must follow the standards prescribed by the Administrator. § 1108.

"It is provided in § 1108(d) that: 'No project shall be approved by the Administrator with respect to any airport unless a public agency holds good title, satisfactory to the Administrator, to the landing area of such airport or the site therefor, or gives assurance satisfactory to the Administrator that such title will be acquired.' The United States agrees to share from 50% to 75% of the 'allow-

able project costs,' depending; so far as material here, on the class and location of the airport. § 1109.

"Allowable costs payable by the Federal Government include 'costs of acquiring land or interests therein or easements through or other interests in air space. . . .' § 1112(a)(2)."

**[3]** Our statutes, codified as G.S. Chapter 63, entitled "Aeronautics," contemplate full cooperation and compliance with federal statutes and rules and regulations of appropriate federal agencies.

**[4, 5]** In our view, when defendant, by lease or otherwise, grants the right to use the Airport, this grant includes the right to use the approach areas necessary to land and take off in the manner prescribed by the Federal Aviation Agency. Hence, if overflights in taking off and landing *in accordance with the rules and regulations of the Federal Aviation Agency* constitute a direct and immediate interference with the enjoyment and use of plaintiff's property to such extent as to impair substantially the fair market value thereof, such overflights would constitute a "taking" *by defendant* of an air easement as appurtenant to the operation of its Airport.

**[6]** This is *an action* to recover compensation for the alleged "inverse condemnation" of a flight easement. In this jurisdiction, where private property is taken for a *public purpose* by a municipality or other agency *having the power of eminent domain* under circumstances such that no procedure provided by statute affords an applicable or adequate remedy, the owner, in the exercise of his constitutional rights, may maintain *an action* to obtain just compensation therefor. *Charlotte v. Spratt,* 263 N.C. 656, 663, 140 S.E. 2d 341, 346, and cases cited. "Inverse condemnation is a device which forces a governmental body to exercise its power of condemnation, even though it may have no desire to do so." Bohannon, Airport Easements, 54 Va. L. R. 355, 373 (1968).

**[5, 7]** Defendant, by the exercise of the power of eminent domain conferred by G.S. 63-5, could have condemned an easement of flight over all of the property of plaintiff for all type aircraft at minimum altitudes of 79, 80 or 90 feet above the surface of the ground and higher. Notwithstanding defendant failed to initiate condemnation proceedings to acquire such easement of flight, plaintiff asserts defendant actually appropriated such easement of flight and by reason thereof is required to pay just compensation for the impairment of the reasonable market value of his property on account thereof.

At the conclusion of plaintiff's evidence and again at the conclusion of all the evidence, defendant moved for nonsuit on the ground

"there is insufficient evidence to take the case to the jury." Defendant excepted to, and now assigns as error, the denial of these motions.

[8]    The evidence, when considered in the light most favorable to plaintiff, was sufficient to permit a jury to find that, beginning in January or February, 1962, and continuously thereafter, the recurring noises, vibrations, air pollution, air currents, etc., from frequent overflights by commercial jets at altitudes ranging from 80 feet above the ground upward to and including 500 feet above the ground substantially and adversely affected the reasonable market value of plaintiff's property. If so, under *Griggs v. Allegheny County, supra,* and as held obliquely in *Charlotte v. Spratt, supra,* this constituted an appropriation or "taking" by defendant of an easement of flight over plaintiff's property and entitled plaintiff to compensation therefor. Accord: *Ackerman v. Port of Seattle,* 348 P. 2d 664, 77 A.L.R. 2d 1344 (Wash. 1960); *Thornburg v. Port of Portland,* 376 P. 2d 100 (Ore. 1962); *Jacksonville v. Schumann,* 167 So. 2d 95 (Fla. Dist. Ct. of Appeal 1964); *Johnson v. City of Greeneville,* 435 S.W. 2d 476 (Tenn. 1968); *Henthorne v. Oklahoma City,* 453 P. 2d 1013 (Okla. 1969); Bohannon, Airport Easements, *supra;* 8 Am. Jur. 2d, Aviation § 7, p. 624; Annotation, 77 A.L.R. 2d 1355 *et seq.*

In *City of Atlanta v. Donald,* 143 S.E. 2d 737 (Ga. 1965), cited by defendant, the Supreme Court of Georgia held the facts alleged in the amended complaint were insufficient to state a cause of action. The opinion pointed out, *inter alia,* the following: "It is utterly impossible for this Court to determine whether or not it was in fact necessary for aircraft using the defendant's airport to pass directly over her property at low altitudes as she alleges." Suffice to say, the allegations and evidence in the present case present an entirely different factual situation.

[9]    On appeal, defendant asserts in its brief that the court should have nonsuited the case because of a material variance between plaintiff's pleading and proof. It is asserted that the complaint (1) alleges overflights by aircraft generally, and (2) it fails to allege when the alleged taking occurred, but the evidence tends to show the taking was caused by overflights of commercial airline jets which began in January or February, 1962. As set forth in our preliminary statement, the allegations of the complaint include specific references to jet aircraft. The variances between plaintiff's pleading and proof were not of such nature as to require nonsuit. Nothing indicates that defendant was misled or otherwise prejudiced. *McCrillis v. Enterprises,* 270 N.C. 637, 643, 155 S.E. 2d 281, 285, and cases

cited. This view is supported by the fact that defendant, at trial, did not assert material variance as a ground for his motions for nonsuit.

The assignments of error directed to the court's denial of defendants motions for nonsuit are without merit and are overruled.

With reference to overflights by jets, the following facts are noted: (1) Overflights by military jets in connection with the Government's operation of Morris Field Airbase ended upon cancellation of the lease on May 13, 1946. Without elaboration, plaintiff testified these planes had "disturbed" him. See *Causby v. United States,* 75 F. Supp. 262 (Ct. Cl. 1948), where Causby, the owner of land adjacent to the Greensboro-High Point Municipal Airport recovered for the temporary easement of flight taken during the period the airport was operated under lease as an airbase. (2) Plaintiff's testimony includes no reference to the F-86 fighter jets and T-33 jet trainers operated by the Air National Guard over plaintiff's property from 1953 until 1961. The only evidence with reference thereto was offered by defendant. Suffice to say, nothing in plaintiff's evidence indicates he considered the overflights by these planes constituted such material interference with the enjoyment of his property as to impair substantially the reasonable market value thereof.

**[10]** Plaintiff's testimony and evidence are to the effect that the direct and immediate interference with the enjoyment and use of his property to such extent as to impair the fair market value thereof began in January or February, 1962, with the frequent and regular overflights of commercial jet aircraft at low altitudes when taking off from and landing on the Airport's northeast-southwest runway. However, plaintiff did not commence this "inverse condemnation" action until September 21, 1967. A portion of plaintiff's evidence relates to occurrences between February, 1962, and September 1, 1967. An equal or greater portion thereof relates to what occurred between September 21, 1967, and the trial at December 9, 1968 Civil Session.

With reference to the first issue, the court's final instruction (mandate) was in these words: " (I)f you find from the evidence and by its greater weight, the burden being upon the plaintiff . . . to so satisfy you, that the flights to and from Douglas Municipal Airport were so low and so frequent or regular as to be a direct and immediate invasion of and interference with the use and enjoyment of the plaintiff's land, and . . . that by reason of said overflights, the reasonable market value of the plaintiff's property was substantially reduced, if you find all of these things and find them by the greater weight of the evidence, the burden being upon the plaintiff to

so satisfy you, then the Court instructs you that this would constitute a taking of a flight or air easement by the defendant City over the lands of the plaintiff and in that event, it would be your duty to answer the first issue, Yes. On the other hand, the Court also instructs you that if you fail to so find it would be your duty to answer the first issue, No."

With reference to the second issue, the court gave this final instruction (mandate) to the jury: "(I)n answering the second and final issue, if you reach it, the Court instructs you that you . . . should first determine the reasonable fair market value of the entire tract of land belonging to the plaintiff *at the present time* without jets and other aircraft flying over it regularly and repeatedly at altitudes ranging from 80 feet above the ground upward to and including 500 feet above the ground and you should then proceed, having determined the fair market value of the property *at the present time* free of a flight or air easement, you would then proceed to determine the reasonable fair market value of the entire tract of land belonging to the plaintiff . . . *at the present time* with jet and other aircraft flying over it regularly and repeatedly at elevations ranging from 80 feet above the ground upward to 500 feet, including 500 feet above the ground. The difference, if any, would be your answer to this issue, if you reach this issue and if you consider it. The answer to this issue, if you reach it and consider it, may be nothing or it may be any amount that you, the jury, find to be just and correct according to the rules of law which I have laid down for your guidance in this process. After you have arrived at the fair market value of the entire tract of land *at the present time* with the flight or air easement of the kind that I have described, if there is no difference in the two values, that is, if those two figures are the same, then you would answer the issue submitted to you, if you reach this second issue, nothing or none. If you find that the fair market value of the entire property *at the present time* in its present condition, that is, with the flight easement of the nature that I have described, and that that reasonable market value has not been and is not now in anywise reduced or diminished by the present situation and present overflights, then you would also answer the second issue nothing or none." (Our italics.)

The jury's answer to the first issue purports to establish that defendant appropriated a flight easement over plaintiff's property *as alleged in the complaint*. The complaint contains no allegation as to *when* the alleged "taking" occurred. Moreover, plaintiff alleged defendant had "taken" a flight easement over his property "for an alti-

tude ranging between *90* feet and 300 feet above the ground over the entire area." (Our italics.) The opinion evidence as to values, referred to in our preliminary statement, relates to altitudes "ranging from *ninety* feet above the ground upward to 500 feet above the ground." (Our italics.) The charge with reference to the second issue relates to altitudes from *80* feet upward to and including 500 feet above the ground. (Note: The judgment refers to *79* feet as the minimum altitude.)

Plaintiff's failure to allege *when* he asserts the flight easement was "taken" by defendant, and the discrepancies between plaintiff's pleadings and evidence with reference to the extent of the airspace defendant had taken, cast doubt upon the significance of the jury's answers to the issues.

[11] Plaintiff's pleadings should have been amended so as to conform to his contentions and proof at trial. A motion for leave to amend prior to the next trial would seem in order. In actions for inverse condemnation, the plaintiff should allege with reasonable specificity when the alleged appropriation or taking occurred and the lower and upper altitudes of the airspace above his property to which the easement relates.

Plaintiff has resided on his property from 1937 until the present time. His testimony is to the effect that the direct and immediate interference with the enjoyment and use of his property to such extent as to impair the fair market value thereof began in January or February, 1962, with the frequent and regular overflights of commercial jet aircraft at low altitudes, when taking off from and landing on the Airport's northeast-southwest runway. However, plaintiff did not commence this "inverse condemnation" action until September 21, 1967. Plaintiff's damages were assessed as of the date of trial in December, 1968.

Assuming a "taking" of an air easement over plaintiff's property *by defendant,* these questions arise: (1) When did the "taking" occur? (2) If the "taking" occurred prior to the date the action was commenced, is the amount of compensation to which plaintiff is entitled determinable as of the date of the taking or as of the date of the commencement of the action? (3) If the "taking" is deemed to have occurred when plaintiff first asserted his right to compensation by the commencement of the action, is the amount of compensation determinable as of the date of the commencement of the action or as of the date of the trial?

Before undertaking to answer these questions, we advert briefly to the statutes of limitation pleaded by defendant. It is first noted

that there is neither allegation nor proof that defendant had acquired a flight easement over plaintiff's property by adverse user for a period of twenty years. Indeed, defendant alleged that any invasion of the airspace over plaintiff's property by aircraft was "inconsequential" and insufficient to constitute a taking of plaintiff's property. Plaintiff has never sought to acquire any flight easement over plaintiff's property by condemnation.

[12, 13]    The three-year statute of limitations would be applicable if plaintiff had elected to sue for damages sustained prior to the commencement of this action "(f)or trespass upon real property." G.S. 1-52(3). However, plaintiff elected to institute this action for "inverse condemnation," charging defendant with having theretofore appropriated a permanent flight easement over his property and that he is entitled to compensation for such permanent easement. Plaintiff's evidence was insufficient to establish a "taking" of such flight easement prior to January or February, 1962. Hence, plaintiff's cause of action, if any, for inverse condemnation accrued in January or February, 1962, and is not barred by any statute of limitations. See *Ackerman v. Port of Seattle, supra.*

[10, 14, 15]    The compensation to which plaintiff is entitled is the difference in the value of his property immediately before and immediately after the "taking" by defendant of the flight easement involved in this action. *Gallimore v. Highway Comm.*, 241 N.C. 350, 353, 85 S.E. 2d 392, 395, and cases cited; *DeBruhl v. Highway Commission*, 247 N.C. 671, 676, 102 S.E. 2d 229, 234, and cases cited; *Charlotte v. Spratt, supra,* at 662; *Johnson v. Airport Authority of City of Omaha,* 115 N.W. 2d 426, 431 (Neb. 1962); *A. J. Hodges Industries, Inc. v. United States,* 355 F. 2d 592, 597 (Ct. Cl. 1966); 8 Am. Jur. 2d, Aviation § 7, p. 625. Plaintiff's evidence is to the effect that defendant appropriated the flight easement in January or February, 1962, and since then has used it continuously and will continue to do so. If this be true, the flight easement so appropriated should be adjudged vested in defendant as of January or February, 1962, and the compensation to which plaintiff is entitled will be determined as of January or February, 1962. A plaintiff cannot, by deferring the institution of his action for inverse condemnation, select a later date for the determination of the compensation to which he is entitled.

Had he elected to do so, plaintiff could have sued for and, subject to a plea of the three-year statute of limitations, recovered damages on account of trespasses occurring prior to the commencement of this action. Having sued to recover compensation for a

flight easement, he waived his right to recover for trespasses subsequent to the date of taking.

**[10]** The conclusion reached is that the compensation to which plaintiff was entitled for a flight easement "taken" by defendant in January or February, 1962, and used continuously thereafter was the difference between the fair market value of plaintiff's property in January or February, 1962, with and without the overflights of jets and other aircraft at altitudes of 80 feet and upward to and including 500 feet. Compensation is not to be determined as of the date plaintiff instituted his action. *A fortiori*, it is not to be determined as of the date of the trial. Hence, the court erred in instructing the jury compensation was to be determined on the basis of the difference of the fair market value of plaintiff's property with and without overflights by jets or other aircraft at the time of the trial and in admitting opinion evidence with reference to such market values at the time of the trial.

For the errors indicated, defendant is awarded a new trial.

New trial.

MOORE, J., did not participate in the consideration or decision of this case.