CHARLES G. LONG, JR., AND WIFE, MARY P. LONG v. CITY OF CHARLOTTE, A MUNICIPAL CORPORATION

No. 132A81

(Filed 13 July 1982)

**1. Appeal and Error § 42— conclusiveness of record**

The Supreme Court will consider only what appears in the record which was before the superior court and will not consider additional "facts" appearing only in the briefs of the parties before it.

**2. Eminent Domain § 1.3— taking of land for public use—just compensation**

The requirement that just compensation be paid for land taken for a public use is guaranteed by the "law of the land" clause of Article I, § 19 of the N.C. Constitution and by the Fourteenth Amendment to the U.S. Constitution.

**3. Aviation § 2; Eminent Domain § 13— harm from aircraft overflights—inverse condemnation as sole remedy**

Inverse condemnation is the sole remedy for recovery by a landowner harmed by aircraft overflights involving an airport owned and operated by a city or county. Therefore, plaintiffs were not entitled to recover for personal injuries and property damages allegedly resulting from direct overflights of aircraft upon allegations of trespass and nuisance.

**4. Aviation § 2; Eminent Domain § 13— aircraft overflights—inverse condemnation—necessity for diminution in market value of property**

In order for a landowner to recover in an inverse condemnation action for the interference with his property by aircraft overflights, the owner must establish not merely an occasional trespass or nuisance, but an interference substantial enough to reduce the market value of his property.

**5. Aviation § 2; Eminent Domain § 13— inverse condemnation—owners not residing directly beneath flight paths**

Recovery in an inverse condemnation action is not limited to those property owners residing directly beneath aircraft flight paths. Rather, a landowner is entitled to compensation if the interference caused by the flights is sufficiently direct, sufficiently peculiar and of sufficient magnitude to support a conclusion that a taking has occurred.

**6. Aviation § 2; Eminent Domain § 5— inverse condemnation—measure of damages**

Where a person's right to possess, use, enjoy or dispose of his land is substantially impaired, his property has been taken, and he is entitled to recover to the extent of the diminution in his property's value, the measure of damages being the difference in the fair market value of the property immediately before and immediately after the taking.

**7. Eminent Domain § 1.3— taking of property for public use—governmental immunity no defense**

Governmental immunity is not a defense where there is a "taking" of private property for public use whether that use be proprietary or governmental in nature.

8. **Aviation § 2; Eminent Domain § 13.4— inverse condemnation—evidence of physical distress and mental anguish**

Evidence of plaintiffs' stress, anxiety, fear, annoyance and loss of sleep and of the denial of their quiet use, possession and enjoyment of their property would be admissible in an inverse condemnation action to prove the cause and extent of the diminution in value of their real property.

9. **Aviation § 2; Damages § 11.2; Eminent Domain § 13.3— punitive damages not allowable against municipal corporation**

No punitive damages are allowable against a municipal corporation unless expressly authorized by statute. Therefore, the trial court properly struck allegations as to punitive damages in an inverse condemnation action against a municipality.

10. **Aviation § 2; Eminent Domain § 13.3— inverse condemnation action—compliance with G.S. Ch. 136 unnecessary**

The trial court properly denied defendant city's motion to dismiss plaintiffs' inverse condemnation action for failure to comply with the provisions of G.S. 136-111.

11. **Aviation § 2; Eminent Domain § 13; Rules of Civil Procedure § 21— inverse condemnation action—trustee and noteholder as necessary parties—order for joinder**

Where plaintiffs in an inverse condemnation action alleged that the value of their property had been so greatly diminished as to be "almost unsellable and almost unlivable," the trustee and holder of the note secured by the deed of trust on the property were necessary parties to the action. However, dismissal of plaintiffs' action for failure to join the trustee and noteholder would not be a proper remedy for nonjoinder, and the trial court properly denied defendant's motion to dismiss for failure to join necessary parties and properly ordered the joinder of the trustee and noteholder. G.S. 1A-1, Rules 19 and 21.

Justice MITCHELL took no part in the consideration or decision of this case.

APPEAL by plaintiffs from judgment of *Snepp, J.,* at the 18 May 1981 Session of Superior Court, MECKLENBURG County, entered out of session by agreement of counsel and filed 29 June 1981, dismissing their trespass and nuisance claims and striking their allegations of punitive damages against the defendant.[1] The

1. This case was consolidated for argument on the City's motion to dismiss the plaintiffs' complaint with more than sixty other cases pending against the City in Mecklenburg County including the case of *Clyde O. Robinson and Louise P. Robinson v. City of Charlotte* (No. 80CVS6036). It so happened that the case *sub judice* and *Robinson* were pending before this Court at the same time and appeared on the same docket. While there are some differences in specific allegations, the complaints in both actions were filed on the same date and are essentially similar in all material respects. The Longs and the Robinsons reside on opposite ends of the new runway—the Longs approximately one mile north of the northern end and the Robinsons approximately one and one-half miles south of the southern end.

appeal was docketed in the Court of Appeals on 10 August 1981. We allowed plaintiffs' petition for discretionary review prior to determination by the Court of Appeals on 6 October 1981.

*Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, P.A., by T. LaFontine Odom and L. Holmes Eleazer, Jr., for plaintiff-appellants.*

*Caudle, Underwood & Kinsey, P.A., by William E. Underwood, Jr. and C. Ralph Kinsey, Jr., for defendant-appellee.*

MEYER, Justice.

The major issue brought forward for review is the permissible scope of relief sought by the petitioners for alleged injuries and damages to their persons and property. More specifically, the issue is whether plaintiffs in addition to recovering for the diminution in the value of their real property upon the theory of inverse condemnation, may recover (1) for personal injuries and property damages resulting from direct overflights upon allegations sounding in trespass and nuisance and (2) punitive damages. For the reasons stated herein, we affirm Judge Snepp's dismissal of the plaintiffs' trespass and nuisance counts and the striking of plaintiffs' allegations for punitive damages and hold that plaintiffs' recovery is limited to the diminution in the value of their real property. We further affirm Judge Snepp's action in striking the allegations of plaintiffs' stress, anxiety, fear, annoyance and

---

Unquestionably, the subject matter of these two cases has significant public interest and involves legal principles of major significance to the jurisprudence of this State. *See* G.S. § 7A-31; Rule 15 of the North Carolina Rules of Appellate Procedure. It was alleged in the *Long* petition that there are over two hundred similar cases against the City of Charlotte currently pending in the Superior Court of Mecklenburg County. It also appears from consent orders entered by Judge Snepp in both the *Long* and *Robinson* cases (similar in all pertinent respects and both signed on 29 June 1981) that forty-five similar cases filed by counsel for Long and eleven similar cases filed by counsel for Robinson against the City were consolidated with "numerous other cases" brought by four other law firms for the purpose of hearing the City's motions to dismiss the complaint. It also appears from those consent orders that "The resolution of these legal questions will govern the individual trials of approximately two hundred cases already pending" and perhaps more to be filed. It appears from the record and briefs before this Court that most of these two hundred pending cases have been continued pending appellate review of the case *sub judice.* Judicial economy and efficiency could best be served by a definitive resolution of the legal questions involved. For these reasons the petitions of both Long and Robinson were allowed for discretionary review prior to determination by the Court of Appeals and consolidated for oral argument before this Court.

loss of sleep as independent elements of damage in the trespass and nuisance counts but hold that evidence of such conditions is admissible to prove the cause and extent of the diminution in value of plaintiffs' real property in the inverse condemnation count.[2]

[1] The matter is before this Court, in effect, on the complaint, pre-answer motions to dismiss, and the order of the court only. The record before us does not contain the arguments of counsel or other matters which transpired at the hearing of the motions. In short, there is little record material before us concerning the facts of the claim. The briefs of both parties contain recitals of facts no doubt well-known to the attorneys who prepared them but which do not appear in and are not supported by the brief record before us. The Supreme Court will consider only what appears in the record which was before the Superior Court and will not consider additional "facts" appearing only in the briefs of the parties before it. See *Penland v. Coal Co.*, 246 N.C. 26, 34, 97 S.E. 2d 432, 438 (1957), wherein this Court, in addressing a similar situation, said:

> The Supreme Court can judicially know only what appears in the record which was before the Superior Court. (Citations omitted.) Accordingly, matters which were not in the record before the Superior Court, but which are sent up with the transcript to the Supreme Court, are no more a part of the record in the Supreme Court than they were in the Superior Court, and may not be made so by certificate of the court below.

We will first examine such facts as may be gleaned from the complaint which, pursuant to Rule 12(b) standards, must be deemed true for the purpose of the trial judge's ruling on the motions and our review of that ruling.

This action against the City of Charlotte (hereinafter "City") was instituted by Mr. and Mrs. C. G. Long on 18 June 1980. In the original complaint there are three "counts" denominated as

---

2. We are not called upon to decide and do not decide the issue of whether one suffering from a specific bodily injury, such as injury to the eardrum affecting hearing (as opposed to several health conditions), resulting directly from passing aircraft may recover from the owner or operator of the aircraft or airport.

follows: "Count I (Inverse Condemnation)," "Count II (Trespass)," and "Count III (Nuisance)," as well as a prayer for compensatory and punitive damages.

The following is a brief summary of the allegations of Count I (Inverse Condemnation) of the complaint. The City of Charlotte owns and operates Douglas Municipal Airport. In 1969 the City approved an expansion of the airport by adding a new 10,000-foot, North/South runway known as "Runway 18R/36L" west of the then existing North/South runway. Land acquisition began in 1969, construction began in 1973 and the new runway was opened for traffic on 19 June 1979. Plaintiffs' property is located approximately one mile north of the northerly end of the new runway and is directly in line with and under the take-off and landing paths of aircraft using the new North/South runway 18R/36L. Since the opening of the new runway substantial numbers of commercial, freight and general aviation aircraft, both civilian and military, jet and propeller-driven, using it have passed directly over, adjacent to and near plaintiffs' property at low altitudes ranging from 100 to 500 feet. Such flights have occurred at all hours of every day and night.

Plaintiffs allege that when the aircraft pass over or near their property, in taking off or landing, they create intense noise and vibration which shake plaintiffs' home so badly that it vibrates the house and personal property and makes ordinary conversation, radio listening, television viewing and any reasonable use of plaintiffs' home impossible. Fumes and other pollutants are emitted from the low-flying aircraft as they pass over or near plaintiffs' property polluting plaintiffs' property, disrupting outdoor activities, and leaving a coat of pollutants on plaintiffs' home, yard, motor vehicles, and other objects. The frequency and intensity of the noise and vibration created by such aircraft at dangerously low altitudes is so great that it is unbearable to a normal human being and has rendered plaintiffs' property greatly diminished in value, almost unsellable and almost unlivable. It is also alleged that the noise and vibration have physically damaged the house itself.

Plaintiffs further allege that as a direct result of the overflights they have been deprived of the free and peaceful use and enjoyment of their property, and therefore their property has

been taken and condemned without just compensation and without due process of law contrary to the North Carolina and United States constitutions. They further allege that prior to the construction of the new runway some residents of the area sought to enjoin the City because of expected damage but their suit was dismissed and therefore the City was, within the context of a public meeting, notified of plaintiffs' claim but failed to respond.

In "Count II (Trespass)," after incorporating the allegations of Count I, plaintiffs allege *inter alia* that the overflights create noise, vibration, air pollutants and dust which invade their property and that they suffer stress, anxiety, fear, annoyance and loss of sleep, all resulting in injury to their physical and mental health; that the City had prior knowledge that these adverse effects would occur and failed to relieve these conditions; and that its continual operation of the runway with such knowledge constitutes intentional, willful, reckless and wanton conduct in utter disregard of plaintiffs' rights and safety and entitle plaintiffs to punitive as well as compensatory damages.

In "Count III (Nuisance)," after incorporating the allegations of Counts I and II, plaintiffs further allege *inter alia* that the City's operation of the new runway constitutes a nuisance which destroys the peaceful use, enjoyment and possession of their property and is injurious to their health; that such nuisance is maintained and will continue to be maintained intentionally, willfully, wantonly and recklessly, with full knowledge of the effects, entitling plaintiffs to recover punitive as well as compensatory damages.

Prior to filing answer, the City of Charlotte filed motions pursuant to Rule 12 of the Rules of Civil Procedure as follows:

(1) to dismiss the inverse condemnation count on grounds that the exclusive remedy available to the plaintiffs was a proceeding under Chapter 136 of the General Statutes with which their action did not comply.

(2) to dismiss the trespass count on the grounds that any trespass which had occurred or might occur would be in the approach of the runway which trespass is sanctioned in the public interest.

(3) to dismiss both the trespass and nuisance counts on the grounds that no claim for relief upon a theory of tort may be stated against the City if it calls into question the City's decision to provide a public facility.

(4) to strike allegations in the complaint concerning the City's advance knowledge of the adverse impact of the runway's operations and its inaction in spite of that prior knowledge on the grounds that such allegations attempted to litigate the propriety and wisdom of the City's decision to construct the runway.

(5) to strike allegations in the complaint concerning plaintiffs' stress, anxiety, fear, annoyance and loss of sleep, etc., on the grounds that the alleged physical and mental injuries are not proper elements of damages in the case.

(6) to dismiss the complaint for failure to join the trustee and holder of the deed of trust on plaintiffs' property as necessary parties to the action.

(7) to strike allegations of the complaint concerning punitive damages on the grounds that punitive damages cannot be awarded against the City.

The plaintiffs subsequently amended their complaint to conform their allegations to the requirements of the Chapter 136 procedure.

The City's Rule 12 motions were heard before Judge Snepp on 19 May 1981 and by agreement of the parties, his rulings were made in an order entered out of session and filed 29 June 1981. In his order Judge Snepp denied the City's motion to dismiss the inverse condemnation count and denied the motion to dismiss for failure to join necessary parties but ruled the holder of the deed of trust and the trustee to be necessary parties and ordered them joined. He granted all of the City's remaining motions to dismiss and to strike. The plaintiffs excepted to those parts of the order granting the City's motions and appealed, and the trial court certified that there was no just cause for delay for purposes of obtaining appellate review. The City cross-assigned as error the denial of its motion to dismiss the inverse condemnation count. We allowed plaintiffs' petition to bypass the Court of Appeals.

We are called upon to determine whether the trial court erred (1) in dismissing the trespass and nuisance counts of the

plaintiffs' complaint, (2) in denying the City's motion to strike plaintiffs' inverse condemnation count for its failure to comply with the requirements of Chapter 136 of the General Statutes, and (3) in denying the City's motion to dismiss for failure to join necessary parties and in ordering the joinder of the trustee and noteholder of an outstanding deed of trust.

(1)

The continuously developing area of the law in the airport noise cases has, as of this date, not fully evolved. Fully developed legal doctrines seldom spring forth full-blown in a single opinion or even a few opinions. As a house is built brick upon brick, doctrines are built decision upon decision until a workable solution is developed and its soundness and logic is finally recognized. We are still in the early stage of this development in the airport cases. Not unexpectedly, there is a confusion of concepts when landowners claiming losses attempt to adapt traditional legal remedies such as inverse condemnation, trespass and nuisance to the relatively new phenomenon of major airport noise damage.

The maxim that "he who owns the soil owns it to the heavens" has given way in face of need created by the rapid growth of air commerce. The right to the exclusive possession of land today extends upward only to the point necessary for its practical use and enjoyment, the balance of the airspace being regarded as open to air commerce and avigation. The landowner still has the right of occupancy incident to his reasonable use and enjoyment of the surface which will prevail over the privilege of invasion of the airspace above the land, but the height to which the landowner may exclusively occupy the airspace varies depending upon what is reasonable under the facts of each case. The same flexibility of result exists in determining how low an airplane may fly over the property of others in taking off and landing. *See Hoyle v. City of Charlotte*, 276 N.C. 292, 172 S.E. 2d 1 (1970); 8 Am. Jur. 2d Aviation § 3 (1980); Annot., 77 A.L.R. 2d 1355 (1961).

The impact of airport and aircraft operations on persons and property has been a fertile source of litigation[3] and legal writing[4]

---

3. *See generally* Annot., 79 A.L.R. 3d 253 (1977) (airport operations as nuisance); Annot., 5 A.L.R. Fed. 440, 447-85 (1970) (suits under the Federal Tort

since the landmark case of *United States v. Causby*, 328 U.S. 256, 90 L.Ed. 1206 (1946), which involved overflights by military aircraft from the Greensboro airport during World War II.

The Fifth Amendment to the United States Constitution provides in pertinent part, "nor shall private property be taken for public use without just compensation." In *Causby*, described as "a case of first impression," the United States Supreme Court faced the issue of whether property was taken within the meaning of this provision by frequent and regular flights of aircraft over respondents' land at low altitudes. The Court found a compensable taking, stating:

> The superadjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. We think that the landowner, as an incident to his ownership, has a claim to it and that invasions of it are in the same category as invasions of the surface.

328 U.S. at 265, 90 L.Ed. at 1212.

[2] Every state constitution, except North Carolina's, contains similar provisions prohibiting the taking of private property for public use without just compensation. 1 Nichols, The Law of Eminent Domain § 4.8 (rev. 3d ed. 1981); Note, *supra*, 24 Syracuse L. Rev. 793 n. 1. While North Carolina does not have an express con-

Claims Act); Annot., 81 A.L.R. 2d 1058 (validity of statute imposing liability for injury or damage occurring from flight or ascent of aircraft) (1962); Annot., 77 A.L.R. 2d 1355 (1961) (airport operations or flights of aircraft as taking or damaging of property); Annot., 66 A.L.R. 2d 634 (1959) (municipal liability for airport-related torts); Annot., 60 A.L.R. 2d 310, § 23 (1958) (injunctive relief against invasion of airspace).

4. Alekshun, *Aircraft Noise Law: A Technical Perspective*, 55 A.B.A.J. 740 (1969); Bohannon, *Airport Easements*, 54 Va. L. Rev. 355 (1968); Faden & Berger, *A Noisy Airport Is a Damned Nuisance!*, 3 Sw. 39 (1971); Harvey, *Landowners' Rights in the Air Age: The Airport Dilemma*, 56 Mich. L. Rev. 1313 (1958); Kettelson, *Inverse Condemnation of Air Easements*, 3 Real Prop., Prob. and Tr. J. 97 (1968); Spater, *Noise and the Law*, 63 Mich. L. Rev. 1373 (1965); Stoebuck, *Condemnation by Nuisance: The Airport Cases in Retrospect and Prospect*, 71 Dick. L. Rev. 207 (1967); Comment, *Governmental Nuisance Liability: An Inadequate Remedy for Aircraft Noise*, 9 Cal. W. L. Rev. 310 (1973); Comment, *The Airport Noise Cases: Condemnation by Nuisance and Beyond*, 7 Wake Forest L. Rev. 271 (1971); Note, *Inverse Condemnation and Nuisance: Alternative Remedies for Airport Noise Damage*, 24 Syracuse L. Rev. 793 (1973).

stitutional provision against the "taking" or "damaging"[5] of private property for public use without payment of just compensation, this Court has allowed recovery for a taking on constitutional as well as common law principles. Stoebuck, *supra,* 71 Dick. L. Rev. 207, 226 n. 102. We recognize the fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of this State, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken. This principle is considered in North Carolina as an integral part of "the law of the land" within the meaning of Article I, Section 19 of our State Constitution.[6] *Midgett v. Highway Commission,* 260 N.C. 241, 132 S.E. 2d 599 (1963); *Debruhl v. Commission,* 247 N.C. 671, 102 S.E. 2d 229 (1958). *See Morganton v. Hutton & Bourbonnais Company,* 251 N.C. 531, 112 S.E. 2d 111 (1960); *Sale v. Highway Commission,* 242 N.C. 612, 89 S.E. 2d 290 (1955); *Eller v. Board of Education,* 242 N.C. 584, 89 S.E. 2d 144 (1955). The requirement that just compensation be paid for land taken for a public use is likewise guaranteed by the Fourteenth Amendment to the Federal Constitution.[7] *City of Raleigh v. Mercer,* 271 N.C. 114, 155 S.E. 2d 551 (1967); *Yarborough v. Park Commission,* 196 N.C. 284, 145 S.E. 563 (1928).

[3] For a landowner harmed by aircraft overflights involving an airport owned and operated by a city or county, inverse condemnation is the remedy most frequently employed. *See* Kettelson, *Inverse Condemnation of Air Easements,* 3 Real Prop., Prob. and Tr. J. 97 (1968). The common law action for inverse condemnation has been recognized by this Court as an appropriate remedy in airport cases. *Hoyle v. City of Charlotte,* 276 N.C. 292, 172 S.E. 2d

---

5. The constitutions of twenty-six states require compensation for "damaging" as well as for "taking." For a list of those states and citations to pertinent provisions of their constitutions, see Stoebuck, *supra,* 71 Dick. L. Rev. 207, 223 n. 87. The apparent purpose of the use of the word "damaged" as well as the word "taken" was to abolish the old test of direct physical injury to the property. *See Chicago v. Taylor,* 125 U.S. 161 (1888).

6. N.C. Const. art. I, § 19 provides in pertinent part, "No person shall be . . . in any manner deprived of his . . . property, but by the law of the land . . . . "

7. The Fourteenth Amendment to the United States Constitution provides in pertinent part, "No State shall . . . deprive any person of . . . property, without due process of law; . . . . "

---

---

1. We hold that the remedy of inverse condemnation is indeed the sole remedy by which the plaintiffs may recover. While in some cases the facts proven may also establish a trespass or a nuisance, such is not required and is not relevant.

While some courts have allowed (and have even shown a preference for) the trespass and nuisance theories,[8] they have been criticized as being inadequate.

> There are basically three legal theories on which land-owners and residents have sought relief: trespass, nuisance and compensation for a taking under the eminent domain theory. The weakness of the trespass theory is having to prove the element of a physical invasion of the landowner's property, meaning there would be liability only when an air-craft enters the zone of airspace 'owned' by the plaintiff. Also, the strict trespass theory requires identifying and naming as defendant the operator of a particular single flight, and only an owner immediately below the flight may maintain a trespass action. The nuisance theory overcomes some of these difficulties, but it protects the landowner's interest inadequately, particularly when there are only infrequent interferences.

Kettelson, *supra*, 3 Real Prop., Prob. & Tr. J. 97.

In Rossi, *Inverse Condemnation and Nuisance: Alternative Remedies For Airport Noise Damage*, 24 Syracuse L. Rev. 793 (1973), the author says:

---

8. *See*, for example, *Nestle v. City of Santa Monica*, 6 Cal. 3d 920, 496 P. 2d 480, 101 Cal. Rptr. 568 (1972). There the court upheld a trial court decision that an action in inverse condemnation could not support recovery for aircraft noise because no diminution of property market value had been shown. But the court reversed the trial court's dismissal of plaintiff's action in nuisance, suggesting that a common law nuisance action could remedy airplane noise interference in some cases in which inverse condemnation would fail. *Thornburg v. Port of Portland*, 233 Or. 178, 376 P. 2d 100 (1962) (inverse condemnation action v. municipal airport; no direct overflights but a question for the jury as to whether there was a taking by noise nuisance); *Greater Westchester v. City of Los Angeles*, 26 Cal. 3d 86, 603 P. 2d 1329, 160 Cal. Rptr. 733 (1979), *cert. denied*, 449 U.S. 820, 66 L.Ed. 2d 22 (1980). *See also* Comment, *Governmental Nuisance Liability: An Inadequate Remedy For Aircraft Noise*, 9 Cal. W. L. Rev. 310 (1973); Stoebuck, *Condemnation by Nuisance: The Airport Cases in Retrospect and Prospect*, 71 Dick. L. Rev. 207 (1967); Comment, *The Airport Noise Cases: Condemnation by Nuisance and Beyond*, 7 Wake Forest L. Rev. 271 (1971).

The remedy most frequently implemented by such landowners, inverse condemnation, is a claim that part of their property, *i.e.*, an air easement for landings and takeoffs, has been taken by the airport without compensation and, therefore, in violation of the fifth amendment provision that 'private property [shall not] be taken for public use without just compensation.' Actions based on this provision have generally been limited to recovery for damage caused by flights which actually pass through a plaintiff's airspace, and even then only to the extent the market value of the property has been decreased. Beyond this constitutionally protected action, landowners have occasionally resorted to the ancient remedies of trespass and nuisance to right their modern wrong . . . . [A]n action in trespass seems unsatisfactory for practical and theoretical reasons, . . . .

In explaining the difficulty with the trespass action, he says that:

> In order to recover in trespass, a landowner would have to prove that his ownership extended to airspace at the altitude of the offending flight, and that the flight transgressed the imaginary vertical boundaries of his land. Even assuming proof of ownership of the invaded space, each trespassing plane must be sued separately. The problem of accurately identifying the plane and the expense of proving a case against each offending craft would normally make suit unprofitable.

24 Syracuse L. Rev. 793 n. 3.

Under our holding, it is of no importance that the taking may be accomplished by trespass or nuisance. Often where nuisance has been alleged, this Court has found the gravamen of the complaint to be a taking of property. *See*, for example, *Clinard v. Kernersville*, 215 N.C. 745, 3 S.E. 2d 267 (1939); *Gray v. High Point*, 203 N.C. 756, 166 S.E. 911 (1932); *Hines v. Rocky Mount*, 162 N.C. 409, 78 S.E. 510 (1913). *See also Midgett v. Highway Commission*, 260 N.C. 241, 132 S.E. 2d 599 (1963); *Ivester v. City of Winston-Salem*, 215 N.C. 1, 1 S.E. 2d 88 (1939); *Rhodes v. Durham*, 165 N.C. 679, 81 S.E. 938 (1914).

Modern construction of the "taking" requirement is that an actual occupation of the land, dispossession of the landowner or

even a physical touching of the land is not necessary; there need only be a substantial interference with elemental rights growing out of the ownership of the property. *Hines v. City of Rocky Mount*, 162 N.C. 409, 78 S.E. 510, held that the odors from a trash dump near the plaintiff's land constituted a nuisance and a taking. *Gray v. City of High Point*, 203 N.C. 756, 166 S.E. 911 (1932), held that odors from an adjacent sewage disposal plant were a nuisance and a taking. *Ivester v. City of Winston-Salem*, 215 N.C. 1, 1 S.E. 2d 88 (1939), held that odors, smoke, ashes, rats, mosquitoes and other insects from a sewage disposal plant next to the plaintiff's premises constituted a nuisance and were a taking of property. Though no physical touching was present in those cases, the wafted smoke, odors, dust, or ashes over the plaintiff's land warranted compensation for a "taking." *See Dayton v. City of Asheville*, 185 N.C. 12, 115 S.E. 827 (1923) (holding that the statute of limitations for eminent domain actions applied to an action to recover damages for smoke, ashes, and odors from a city incinerator next to the plaintiff's land). *See also City of Louisville v. Hehemann*, 161 Ky. 523, 171 S.W. 165 (1914); *City of Georgetown v. Ammerman*, 143 Ky. 209, 136 S.W. 202 (1911); *Brewster v. City of Forney*, 223 S.W. 175 (Tex. Comm. App. 1920); *Jacobs v. City of Seattle*, 93 Wash. 171, 160 P. 299 (1916).

In order to recover for inverse condemnation, a plaintiff must show an actual interference with or disturbance of property rights resulting in injuries which are not merely consequential or incidental; a "taking" has been defined as "entering upon private property for more than a momentary period, and under warrant or color of legal authority, devoting it to a public use, or otherwise informally appropriating or injuriously affecting it in such a way as substantially to oust the owner and deprive him of all beneficial enjoyment thereof." *Penn v. Coastal Corp.*, 231 N.C. 481, 57 S.E. 2d 817 (1950).

Obviously not every act or happening injurious to the landowner, his property, or his use thereof is compensable. Landowners must suffer the usual, normal and occasional disturbances, annoyances and discomforts of life such as a passing siren, a humming transformer or electric substation, the odor of a sewage treatment plant or paper mill "when the wind is right," a distant sonic boom or airplanes passing high overhead.

Flights at altitudes that would in no way damage or interfere with the use and enjoyment of land have been held not to constitute a taking or damaging of the property, the permissible altitude being determined by the circumstances and facts peculiar to each situation, and it has been recognized that there must be a substantial interference with the use and enjoyment of the land, not merely incidental damage, before a taking results. 77 A.L.R. 2d 1355, 1360.

> A compensable taking of a flight or avigation easement does not occur until overflights constitute a *material* interference with the use and enjoyment of property, such that there is substantial diminution in fair market value.

*Cochran v. City of Charlotte*, 53 N.C. App. 390, 397, 281 S.E. 2d 179, 186 (1981) (emphasis original), *cert. denied*, 304 N.C. 725, 288 S.E. 2d 380 (1982).

> As stated in *Causby*, "Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." 328 U.S. at 266, 90 L.Ed. at 1213.

The public importance and social utility of commercial aircraft and publicly owned and operated airports must be balanced against the inconvenience, annoyance and aggravation to those in their vicinity. This balancing of interests necessarily and properly places a heavy burden on the landowner.

[4] The individual must bear a certain amount of inconvenience and loss of peace and quiet as the cost of living in a modern progressive society. *Martin v. Port of Seattle*, 391 P. 2d 540 (Wash. 1964). The balance of interests is established by the requirement that in order to recover for the interference with one's property, the owner must establish not merely an occasional trespass or nuisance, but an interference substantial enough to reduce the market value of his property. If the individual landowner is unusually sensitive to interference caused by airport operations not sufficiently substantial to constitute a taking, the public interest in maintaining the airport operations leaves him without remedy. On the other hand, if the interference caused by the airport's operation is sufficient to cause a diminution in the market value of the property, the right of individuals to use and enjoy

their property requires that the public bear the cost of the taking of that property.

[5] Recovery is not limited to those property owners residing directly beneath flight paths. A rule which denies recovery to a landowner who does not occupy land directly beneath the take-off and landing routes (the glidepath) of an airport is indefensible so long as a landowner who is subject to direct overflights and suffers identical damages is allowed a full recovery. Without regard to the *elements* of damage or injury and with regard only to the issue of compensability (entitlement to recover), the fair and logical rule is that a landowner is entitled to compensation if the interference caused by the flights is sufficiently direct, sufficiently peculiar and of sufficient magnitude to support a conclusion that a taking has occurred.

The test is whether the value of plaintiffs' property has been substantially impaired by a taking.

We point out that:

> The word 'property' extends to every aspect of right and interest capable of being enjoyed as such upon which it is practicable to place a money value. The term comprehends not only the thing possessed but also, in strict legal parlance, means the right of the owner to the land; the right to possess, use, enjoy and dispose of it, and the corresponding right to exclude others from its use.

*Hildebrand v. Telegraph Co.*, 219 N.C. 402, 408, 14 S.E. 2d 252, 256 (1941). *See United States v. General Motor Corp.*, 323 U.S. 373, 89 L.Ed 311 (1945).

[6] Thus, where a person's right to possess, use, enjoy or dispose of his land is substantially impaired, his property has been taken, and he is entitled to recover to the extent of the diminution in his property's value. *Eller v. Board of Education*, 242 N.C. 584, 89 S.E. 2d 144; *Clinard v. Kernersville*, 215 N.C. 745, 3 S.E. 2d 267. The measure of damages is the difference in the fair market value of the property immediately before and immediately after the taking. *See* 5 N.C. Index 3d, Eminent Domain § 5 (1977). It is clear from the allegations of the complaint that plaintiffs allege a "taking" as of the date of the opening of the new runway 18R/36L on 19 June 1979 by which their "property has been condemned and

made almost useless," "greatly diminished in value," and "almost unsellable and almost unlivable."

[3]   Since inverse condemnation is the sole remedy by which the plaintiffs may recover,[9] Judge Snepp was correct in dismissing plaintiffs' trespass and nuisance counts.

---

9. It is perhaps appropriate at this point to allude to a decision in a federal case pertinent to the consideration of the issues before us now. The petitioner, Charles G. Long, together with others, not including the petitioners Robinson, filed suit in the United States District Court for the Western District of North Carolina (C-C-79-356) to compel the Federal Aviation Administration to take certain steps to control excessive aircraft noise near their homes. By an Order of Dismissal dated 17 March 1980 and filed 18 March 1980, United States District Court Judge James B. McMillan dismissed the suit because the plaintiffs had no legal remedy against the FAA Administrator under the Federal Aviation Act. 49 U.S.C. § 1348. In Section II of the order, entitled "Remedies Against the Airport Operator," Judge McMillan stated in effect that he would be more willing to recognize a right to sue the Administrator if he were convinced that plaintiffs' legal remedies against the City of Charlotte were as bleak as the plaintiffs contended. Judge McMillan stated that, "[a]ccording to Plaintiffs, their only relief would be through an inverse condemnation suit in which they would be able to recover only the difference in the fair market value of their property before and after the City 'took' the air easement over their homes." He then concluded that this would indeed be a harsh and unjust result and he suggested that in order to avoid it a court "should consider creating an adequate remedy against the city or the FAA" on constitutional grounds. He further concluded, however, that the court "need not undertake the task of fashioning an adequate legal remedy" because "it is clear that one is already provided by state law." Judge McMillan then proceeded to say that those plaintiffs, under North Carolina law, "could recover for *all* injuries" on the theory of *trespass,* including "compensation for loss of property value, injury to health, and the expense of acquiring and moving to another residence to avoid further injury, and mental suffering." Judge McMillan stated that "*punitive* damages are available for trespass to the same extent as for other torts. If punitive damages are recoverable at all against a North Carolina municipality, . . . they would appear to be available in this case." (Emphasis original.) He also concluded that punitive damages would be available under the nuisance theory. The issue of the availability of punitive damages against the City is decided to the contrary elsewhere in this opinion. In the interpretation of whether State law permits punitive damages for common law liability, the federal courts are bound by State decisions. *See United Mine Workers of America v. Patton,* 211 F. 2d 742 (4th Cir. 1954), *cert. denied,* 348 U.S. 824, 99 L.Ed. 649.

Judge McMillan's remarks with regard to those plaintiffs' rights against the City of Charlotte in the case before him are pure dictum as those issues were not necessary to a decision as to whether a remedy existed against the FAA Administrator nor even presented in the case. Clearly we are not bound by Judge McMillan's pronouncements on those issues. Even if those issues have been before him, we would not be bound by his determination of them. Just as federal courts are not bound by State court precedents on federal questions, State courts are not bound by federal court precedents on State questions. 20 Am. Jur. 2d, Courts §§ 222, 225 (1965).

[7]  We note that a significant portion of appellants' brief is devoted to the proposition that the operation of Douglas Municipal Airport is a proprietary function. Having determined that appellants' sole remedy is in the nature of inverse condemnation (as opposed to trespass or nuisance) and that recovery is limited to diminution in value of appellants' property, the question of whether the operation of municipal or county owned airports is a governmental or a proprietary function is no longer of consequence here. If a "taking" has occurred, it is compensable though it results from a function which is governmental in nature. Governmental immunity is not a defense where there is a "taking" of private property for public use whether that use be proprietary or governmental in nature. "The test of liability is whether, notwithstanding its acts are governmental in nature and for a lawful public purpose, the municipality's acts amount to a partial taking of private property. If so, just compensation must be paid." *Insurance Co. v. Blythe Brothers Co.*, 260 N.C. 69, 79, 131 S.E. 2d 900, 907 (1963); *Hines v. Rocky Mount*, 162 N.C. 409, 78 S.E. 2d 510 (1913).

The trial court struck certain enumerated paragraphs relating to damages appearing within the counts which were in turn dismissed in their entirety. All of the paragraphs relating to plaintiffs' physical distress and mental anguish and punitive damages which were stricken from the complaint appear in Count I (Trespass) and Count II (Nuisance), both of which were dismissed in their entirety. The question which then arises is whether such allegations would be proper in an inverse condemnation count. While this issue is not before us, it will likely arise in the further proceedings in this and similar cases. In the interest of judicial efficiency, we will now consider whether the trial court erred in (A) striking plaintiffs' allegations of physical distress and mental anguish, and (B) striking plaintiffs' allegations and prayer for punitive damages.

(A)

[8]  Plaintiffs' stricken allegations concerning physical distress and mental anguish as contained in the trespass count were: "The landing and taking-off 'Aircraft' have caused plaintiffs stress, anxiety, fear, annoyance and loss of sleep thereby injuring the physical and mental health of plaintiffs causing them great physi-

cal and mental suffering." Also stricken was plaintiffs' allegation that: "The Aircraft with their attendant intense noise, vibration and air pollution have . . . denied them quiet use, possession and enjoyment of their property . . . . " Likewise stricken were plaintiffs' allegations that the aircraft and their attendant circumstances "damaged the physical and mental health of the plaintiffs." Similar allegations in Count III (Nuisance) were to the effect that the conditions were "injurious to plaintiffs' health and well being" and caused them "great annoyance."

The trial court properly struck these allegations as they were stated as independent elements of damage resulting from the alleged torts of the trespass and nuisance counts which were stricken. Had these same allegations appeared in the inverse condemnation count to show the cause and extent of the diminution in value of the property, a different result would have obtained.

In any event plaintiffs are not prejudiced by the absence of those allegations in the context of this case because the same evidence concerning plaintiffs' stress, anxiety, fear, annoyance and loss of sleep, and the denial of their quiet use, possession and enjoyment of the property which would have supported the stricken allegations is admissible to prove the allegations of diminution in fair market value of the property in the inverse condemnation count. *See* 4A Nichols, The Law of Eminent Domain §§ 14.241, 14.246-.247 (rev. 3d ed. 1981); 1 Stansbury's North Carolina Evidence § 100 (Brandis rev. 1973).

In *R. R. v. Armfield,* Hoke, J., in discussing the damage elements of smoke and noise occurring in connection with a railroad right-of-way, said this:

> [I]n these and all other cases where this question of condemning a right of way is substantially presented, the principle, as stated, is only intended to exclude considerations of sentiment or personal annoyance detached from any effect on the pecuniary value of the property or the allowance of damages purely of a speculative character, and accordingly it is held here and in well considered cases elsewhere that in awarding damages for a railroad right of way plaintiff shall be allowed to recover the market value of the property actually included, and for the impairment of value done to the remainder,

and that in ascertaining the amount it is proper, among other things, to consider the inconvenience and annoyances likely to arise in the orderly exercise of the easement which interfere with the use and proper enjoyment of the property by the owner and which sensibly impair its value, and in this may be included the injury and annoyance from the jarring, noise, smoke, cinders, etc., from the operating of trains and also damage from fires to the extent that it exists from close proximity of the property and not attributable to defendant's negligence. (Citations omitted.) And it may be well to note that these damages are allowed and estimated, as stated, on the theory that the right is to be exercised in an orderly and proper manner; for notwithstanding the acquirement of such an easement, if an owner is subsequently injured in his proprietary rights by the negligence on the part of the company, a case presented in *Duval v. R. R.*, 161 N.C. 448, and to some extent involved in *Thomason v. R. R., supra,* or if, in the enjoyment of the right, a nuisance is clearly and unnecessarily created, a case presented in *R. R. v. Fifth Baptist Church,* 108 U.S., 317, an action lies, and because it does, compensation for injuries attributable to negligence, etc., are not as a rule included.

167 N.C. 464, 467-68, 83 S.E. 809, 811 (1914).

In the early case of *R. R. v. Church,* 104 N.C. 525, 530-31, 10 S.E. 761, 763 (1889), land was being condemned for a railroad right-of-way, and evidence that passing trains interrupted and disturbed the church services, distracted the worshippers, and frightened the worshippers' horses was held to be admissible on the question of the diminution of the value of the site for a church and not as separate items of damages. Merrimon, C.J., speaking for the Court said:

The purpose of the evidence was not, as contended on the argument, to show how much or how little the worshippers, severally or collectively, were, would or might be shorn of religious impressions and advantages, but to show that the property was less valuable in that worshippers would not go there, but would find some safer, more quiet and agreeable place to worship, until the church as a place of worship would be deserted and of little or no value for church purposes, un-

til the church building would be useful only to be torn down and the lumber devoted to other purposes, and the land would be worth for any other purpose only a nominal price.

*Church* was cited in *R. R. v. Manufacturing Co.*, 169 N.C. 156, 85 S.E. 390 (1915), as "direct and valuable authority" in pointing out "the marked difference between showing a diminution in value of the property, on account of the several annoyances from passing trains, and proving them for the purpose of recovering special damages for the annoyance itself, as a distinct element of damage. The one is proper, and the other is not." It should be noted, however, that *Church, Armfield* and *Manufacturing Co.* involved physical occupation of land for railroad rights-of-ways and that at that time and stage in the development of our law, evidence of the elements of smoke and noise was admitted because they accompanied an actual physical invasion. They are cited here only for the purpose of illustrating that such evidence was admitted solely for the purpose of showing its influence on the diminution in value of the real property.

We conclude that the trial court did not err in striking the allegations concerning plaintiffs' physical distress, mental anguish and the denial of their quiet use, possession and enjoyment of their property as they were alleged in the trespass and nuisance counts for the purpose of recovering special damages for them as independent and distinct elements of damage separate and apart from their effect on the value of the property. Such allegations would be appropriate in an inverse condemnation count only for the purpose of showing their effect, if any, on the cause and extent of the diminution in the value of the real estate.

(B)

[9] The petitioners also assign as error the striking of their punitive damage allegations in Count II (Trespass) and Count III (Nuisance) of their complaint. Apparently the question of whether punitive damages may be allowed against a municipality is one of first impression with us. We are unable to discover any North Carolina case deciding the issue of whether punitive damages may be assessed against a governmental body. The common law and the overwhelming weight of modern authority have rejected the award of punitive damages against a municipal corporation. Annot., *Recovery of Exemplary or Punitive Damages From*

*Municipal Corporation*, 1 A.L.R. 4th 448 (1980). The general rule is that no punitive damages are allowed against a municipal corporation unless expressly authorized by statute. *See generally* F. Burdick, The Law of Torts § 200 at 245 (4th ed. 1926); 4 J. Dillon, The Law of Municipal Corporations § 1712 (5th ed. 1911); 18 McQuillan, Mun. Corp. § 53.18a (rev. 3d ed. 1977); *Municipal Liability for Exemplary Damages*, 15 Clev-Mar L. Rev. 304 (1966).

In *Newport v. Facts Concerts, Inc.*, 453 U.S. 247, 69 L.Ed. 2d 616 (1981), the United States Supreme Court held that a municipality is immune from punitive damages under 42 U.S.C. § 1983. In that case the Court examined at length the historical and public policy considerations of allowing punitive damages against municipalities and other governmental agencies and concluded that neither consideration supports exposing a municipality to punitive damages for the bad faith actions of its officials.

> Punitive damages by definition are not intended to compensate the injured party, but rather to *punish* the tortfeasor whose wrongful action was intentional or malicious, and to *deter* him and others from similar extreme conduct. (Citations omitted.) Regarding retribution, it remains true that an award of punitive damages against a municipality 'punishes' only the taxpayers, who took no part in the commission of the tort . . . . Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers (emphasis added).

453 U.S. at 266-67; 69 L.Ed. 2d at 632.

> Ordinarily it is the wrongdoer himself who is made to suffer for his conduct by the imposition of punitive damages — here it is the governmental entity itself. The retributive purpose is not significantly advanced, if it is advanced at all, by exposing municipalities to punitive damages.

> With regard to the *deterrent* aspect, the Court noted that it is far from clear that municipal officials, including those at the policymaking level, would be deterred from wrongdoing by the

threat of large punitive awards against the wealth of their municipality and its taxpayers. This is particularly true in the absence of a law making indemnification available to the municipality. Likewise, there is no reason to suppose that corrective action such as discharge of the offending officials who were appointed or the removal of those who were elected will occur simply because punitive damages are awarded against the municipality. 453 U.S. at 268-69; 69 L.Ed. 2d at 632-33.

We believe that public policy considerations[10] mitigating against allowing assessment of punitive damages are compelling and are applicable to the actions of municipal corporations without regard to whether the function is governmental or proprietary. We hold that in the absence of statutory provisions to the contrary, municipal corporations are immune from punitive damages. The trial court did not err in striking those allegations of the complaint alleging punitive damages.

We likewise find no error in the striking of plaintiffs' allegations of prior notice by the defendant of the likely consequences of construction and use of the new runway as they were supportive only on the issue of punitive damages and are not pertinent to the issue of diminution in value of plaintiffs' property.

(2)

[10]    The City cross-assigned as error the trial court's denial of its motion to dismiss plaintiffs' Count I (Inverse Condemnation)

---

10. With regard to public policy considerations, the United States Supreme Court in *Newport* sounded an alarm in view of the anticipated effect of one of its recent opinions broadening the liability of municipalities:

Finally, although the benefits associated with awarding punitive damages against municipalities under § 1983 are of doubtful character, the costs may be very real. In light of the Court's decision last Term in *Main v. Thiboutot*, 448 US 1, 65 L Ed 2d 555, 100 S Ct 2502 (1980), the § 1983 damages remedy may now be available for violations of federal statutory as well as constitutional law. But cf. *Middlesex Cty. Sewerage Authority v National Sea Clammers Assn.* --- US ---, 69 L Ed 2d 435, 101 S Ct --- (1981). Under this expanded liability, municipalities and other units of state and local government face the possibility of having to assure compensation for persons harmed by abuses of governmental authority covering a large range of activity in everyday life. To add the burden of exposure for the malicious conduct of individual government employees may create serious risk to the financial integrity of these governmental entities.

453 U.S. at 270, 69 L.Ed. 2d at 634.

for failure to comply with the provisions of Chapter 136 of the General Statutes (G.S. § 136-111).

Article 9 of Chapter 136 of the General Statutes vests eminent domain power in the Department of Transportation. It also provides a procedure to be used by the Department commonly known as the "Quick-take" procedure. Chapter 216 of the 1967 N.C. Session Laws authorizes the City of Charlotte to utilize the "quick-take" procedures of Article 9, Chapter 136, in acquiring land for airport purposes. *See also* 1969 N.C. Sess. Laws ch. 384. The April 1967 amendment to Section 7.81 of the City Charter only added Chapter 136 of the General Statutes to the procedures that the City is authorized to use. The specific language of Section 7.81 of the charter provides:

> In the exercise of the power of eminent domain, the city is hereby vested with all power and authority now or hereafter granted by the laws of North Carolina applicable to the City of Charlotte, and the city shall follow the procedures now or hereafter prescribed by said laws; provided, that in the exercise of its authority of eminent domain for the acquisition of property to be used for streets and highways, water and sewer facilities, airport purposes, and off-street parking and parks, and for all other purposes authorized by the provisions to G.S. 160A-241; *the City of Charlotte is hereby authorized to use the procedure and authority prescribed in Article 9 of Chapter 136* of the General Statutes of North Carolina. . . . (Emphasis added.)

The City contends that because it is "authorized" to use this statutory procedure it is the exclusive remedy available to the plaintiffs and their failure to employ it entitles the City to dismissal of plaintiffs' inverse condemnation count. We cannot agree. The City also suggests that under Chapter 136 procedures plaintiffs, as well as many others, would be barred by the statute of limitations as it was not filed within two years of 19 June 1979, the date runway 18R/36L was opened.

The City's contention that the Chapter 136 procedure is the exclusive remedy available to the plaintiffs is supported by neither statutory or case law nor logic. Legislative authority for the exercise of the power of eminent domain for airport purposes is found in Chapter 63 of the General Statutes (specifically G.S.

§ 63-5). The procedure to be used is not specified by Chapter 63. Neither is the procedure specified in the general legislative authority for municipal exercise of eminent domain, G.S. § 160A-241. That section does however refer to the procedures which *may* be used by municipalities:

In exercising the power of eminent domain, a city *may in its discretion* use the procedures of Article 2 of Chapter 40 of the General Statutes, or the procedures of this Article, or the procedures of any other general law, charter or local act applicable to the city.

G.S. § 160A-241 (emphasis added).

It thus appears that the City has several procedures available to it and from which it can choose in condemning property for airport purposes, to-wit: the procedures of Chapter 40, Chapter 136, and Chapter 160A. Certainly it is not restricted to the procedures to which it seeks to restrict the plaintiffs.

We find no indication in either the City Charter provision or Chapter 160A that, because the *City* is authorized to use the Chapter 136 procedures against property, *landowners* are required or even authorized to use those procedures *against* the city. Where there is an adequate statutory remedy, North Carolina is in accord with the general rule that an action for inverse condemnation will not be recognized. *Williams v. Highway Commission*, 252 N.C. 772, 114 S.E. 2d 782 (1960). Even though not factually pertinent, we find the following language in *Midgett v. Highway Commission*[11] instructive:

The statutory remedy for the recovery of damages to private property taken for public service is ordinarily exclusive, and when the statutory procedure is available, the owner, failing to pursue the statutory procedure, may not institute an action in superior court to recover his damages. (Citation omitted.) But there is an exception to this rule. A constitutional prohibition against taking or damaging private property for public use without just compensation is self-executing, and

---

11. 260 N.C. 241, 250, 132 S.E. 2d 599, 608. *Midgett* deals with a situation in which the statute of limitations would have run before the property owner would have been expected to know that an interest in his property had been appropriated. *See also Eller v. Board of Education*, 242 N.C. 584, 89 S.E. 2d 144.

neither requires any law for its enforcement nor is suscepti-
ble of impairment by legislation. And where the Constitution
points out no remedy and no statute affords an adequate
remedy under a particular fact situation, the common law
will furnish the appropriate action for adequate redress of
such grievance.

Chapter 160A clearly contemplates landowner recourse to a com-
mon law inverse condemnation action where there has been an
uncompensated taking by a municipality and even provides for
payment by the City of the costs of a successful landowner's ac-
tion. G.S. § 160A-243.1.

We conclude that the trial court did not err in denying the
City's motion to dismiss plaintiffs' Count I (Inverse Condemna-
tion).

(3)

[11]  The trial court denied the City's motion to dismiss for
failure to join the trustee and *cestui que trust* of a deed of trust
on the plaintiffs' property but concluded that they are "necessary
parties" and ordered their joinder. Such action by the trial court
is specifically authorized by Rule 19 of the Rules of Civil Pro-
cedure if they are indeed necessary parties. The question here is
whether under the allegations of the complaint the trustee and
noteholder are parties without whom a judgment completely and
finally determining the controversy cannot be rendered. Looking
to the complaint we find that plaintiffs have alleged in the surviv-
ing inverse condemnation count that the value of their property
has been so greatly diminished as to be "almost unsellable and
almost unlivable." This allegation cannot be otherwise interpreted
than to mean that their property has almost no market value and
virtually cannot be occupied as a residence. Assuming this allega-
tion to be true, as we must, the trustee and the holder of the note
secured by the deed of trust on that property would be vitally in-
terested in having the debt satisfied from the proceeds of the
jury verdict.[12]

---

12. The factual allegations in plaintiffs' brief concerning their notice of the suit
to the noteholder, the balance due on the note secured by the deed of trust, the at-
titude of noteholder concerning being joined, etc., are an embellishment of the facts
by counsel not appearing in or supported by the complaint. As such we disregard
them.

Rule 19 of the Rules of Civil Procedure provides in part:[13]

(a) . . . those who are united in interest must be joined as plaintiffs or defendants; but if the consent of anyone who should have been joined as plaintiff cannot be obtained he may be made a defendant, the reason therefor being stated in the complaint; . . . .

(b) *Joinder of Parties Not United in Interest.* The court may determine any claim before it when it can do so without prejudice to the rights of any party or to the rights of others not before the court; but when a complete determination of such claim cannot be made without the presence of other parties, the court shall order such other parties summoned to appear in the action.

Necessary parties *must* be joined in an action. Proper parties *may* be joined. Whether proper parties will be ordered joined rests within the sound discretion of the trial court. *Booker v. Everhart,* 294 N.C. 146, 240 S.E. 2d 360 (1978). A party is a necessary party to an action when he is so vitally interested in the controversy involved in the action that a valid judgment cannot be rendered in the action completely and finally determining the controversy without his presence as a party. *Strickland v. Hughes,* 273 N.C. 481, 160 S.E. 2d 313 (1968); *Manning v. Hart,* 255 N.C. 368, 121 S.E. 2d 721 (1961); *Garrett v. Rose,* 236 N.C. 299, 72 S.E. 2d 843 (1952). When a complete determination of the matter cannot be had without the presence of other parties, the court must cause them to be brought in. *MacPherson v. City of Asheville,* 283 N.C. 299, 196 S.E. 2d 200 (1973); *Strickland v. Hughes,* 273 N.C. 481, 160 S.E. 2d 313.

The noteholder and trustee here are persons "united in interest" with the owners and whose presence is necessary in order for the court to determine the claim before it without prejudicing their rights. *See Ludwig v. Hart,* 40 N.C. App. 188, 252 S.E. 2d 270, *cert. denied,* 297 N.C. 454, 256 S.E. 2d 807 (1979). Yet, dismissal of plaintiffs' action for failure to join the trustee and

13. These rules make no substantive change in the rules relating to joinder of parties as formerly set out in G.S. § 1-70 and G.S. § 1-73. Both G.S. § 1-70 and G.S. § 1-73 were repealed by 1967 Session Laws ch. 954, s. 4, effective 1 January 1970. *Booker v. Everhart,* 294 N.C. 146, 240 S.E. 2d 360 (1978). 1 McIntosh, North Carolina Practice and Procedure 2d, § 585 (Supp. 1970).

noteholder would not be an appropriate remedy for nonjoinder. Rule 21 of the Rules of Civil Procedure provides that neither misjoinder nor nonjoinder of parties is a ground for dismissal of an action. *See Booker v. Everhart*, 294 N.C. 146, 240 S.E. 2d 360. The trial court properly ordered the joinder of the trustee and noteholder and properly denied the City's motion to dismiss.

Having found no error prejudicial to either party, the order of the trial court filed and entered on 29 June 1981 out of session by stipulation of the parties is hereby in all respects

Affirmed.

Justice MITCHELL took no part in the consideration or decision of this case.