BEROTH OIL COMPANY, PAULA AND KENNETH SMITH, BARBARA CLAPP, PAMELA MOORE CROCKETT, W.R. MOORE, N&G PROPERTIES, INC. AND ELTON V. KOONCE, PLAINTIFFS v. NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, DEFENDANT

No. COA11-1012

(Filed 15 May 2012)

**1. Appeal and Error—interlocutory orders and appeal— denial of class certification—substantial right**

The Court of Appeals addressed the merits of plaintiffs' appeal from the trial court's interlocutory order denying plaintiffs' motion for class certification as the order affected a substantial right.

**2. Class Actions—denial of class certification—ends-means analysis proper—failure to establish existence of class**

The trial court did not abuse its discretion in denying plaintiffs' motion for class certification of their inverse condemnation claim. The court trial correctly relied upon "ends-means" analysis in concluding that individual issues would predominate over common issues and that plaintiffs failed to establish a class. The Court of Appeals did not reach the issue of whether the class action mechanism would have been the superior method for adjudication of the matter.

**3. Appeal and Error—inverse condemnation—equal protection—not properly before court**

Plaintiffs' argument that the trial court's order in an inverse condemnation case resulted in unequal treatment for similarly situated property owners was not addressed as it was not properly before the Court of Appeals.

Appeal by Plaintiffs from order entered 20 May 2011 by Judge Lindsay R. Davis, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 8 February 2012.

*Hendrick Bryant Nerhood & Otis, LLP, by Matthew H. Bryant, T. Paul Hendrick, Timothy Nerhood, and Kenneth C. Otis III, for Plaintiff-appellants.*

*Attorney General Roy Cooper, by Assistant Attorney General Dahr Joseph Tanoury, for Defendant-appellee.*

HUNTER, JR., Robert N., Judge.

Beroth Oil Company, Barbara Clapp, Pamela Moore Crockett, W.R. Moore, N&G Properties, Inc., Elton V. Koonce, and Paula and Kenneth Smith (collectively, "Plaintiffs") appeal from the trial court's 20 May 2011 order denying Plaintiffs' motion for class certification pursuant to Rule 23 of the North Carolina Rules of Civil Procedure. For the following reasons, we affirm.

## I. Factual & Procedural Background

Plaintiffs are owners of real property located in Forsyth County in an area, hereinafter referred to as "the Northern Beltway," designated by the North Carolina General Assembly for highway construction. *See* N.C. Gen Stat. § 136-175 et seq. (2011). The proposed development consists of a 34-mile highway that loops around the northern part of Winston-Salem. The project ("the Northern Beltway Project") contemplates development of two sections: a section extending from U.S. 158 to U.S. 52 in western Forsyth County ("the Western Loop"), and a section extending from U.S. 52 to U.S. 311 in eastern Forsyth County ("the Eastern Loop").[1] Plaintiffs own property in both sections of the proposed development area.

On 6 October 1997, acting pursuant to powers vested in it under § 136-44.50 et seq. of our General Statutes (hereinafter referred to as "the Map Act"), Defendant North Carolina Department of Transportation ("NCDOT") filed a transportation official corridor map for State project R-2247 with the Forsyth County Register of Deeds. Project R-2247 entails construction of the Western Loop section of the Northern Beltway Project and extends across approximately 579 parcels of land in western Forsyth County. The corridor map was

> prepared for the purpose of setting forth the location of portions of the proposed Western Loop. Any property included within the Roadway Corridor shown on the Official Map is subject to restrictions on the issuance of building permits and subdivision approvals, and may be eligible for a special tax valuation.

---

1. The Northern Beltway Project has been in the works for more than two decades. In 1989, our General Assembly established the North Carolina Highway Trust Fund to finance the construction of "urban loops" around designated urban areas. *See* N.C. Gen. Stat. § 136-175 et seq. (2011). The area encompassed by the Northern Beltway Project was and remains designated for development. N.C. Gen. Stat. § 136-180 (2011).

BEROTH OIL CO. v. N.C. DEP'T of TRANSP.

[220 N.C. App. 419 (2012)]

NCDOT subsequently filed corridor maps on 26 November 2008 in furtherance of State projects U-2579 and U-2579A, which contemplate development of the Eastern Loop section of the Northern Beltway Project. State projects U-2579 and U-2579A span across between 1,808 and 1,929 parcels located in the eastern portion of Forsyth County.[2] Along with each of these corridor maps, NCDOT filed a list of landowners who, based upon Forsyth County tax records, owned real property within the protected corridor and would therefore be affected by these maps of reservation.

When a corridor map is filed, the Map Act imposes certain statutory restrictions on landowners within the corridor. N.C. Gen. Stat. § 136-44.51 (2011). These include restrictions on the development of the affected property:

> (a) After a transportation corridor official map is filed with the register of deeds, no building permit shall be issued for any building or structure or part thereof located within the transportation corridor, nor shall approval of a subdivision . . . be granted with respect to property within the transportation corridor.

N.C. Gen. Stat. § 136-44.51(a) (2011).

The Map Act provides for three forms of administrative relief in order to alleviate the potentially negative impact of these restrictions. First, the Map Act authorizes NCDOT to acquire individual parcels within the protected corridor where the acquisition is determined "to be in the best public interest to protect the transportation corridor from development or when the transportation corridor official map creates an undue hardship on the affected property owner." N.C. Gen. Stat. § 136-44.53(a) (2011). To qualify for this relief, hereinafter referred to as the "Hardship Program," the affected property owner must file a written request that:

> (1) Supports the hardship acquisition by providing justification, on the basis of health, safety or financial reasons, that remaining in the property poses an undue hardship compared to others; and

> (2) Documents an inability to sell the property because of the impending project, at fair market value, within a time period that is typical for properties not impacted by the impending project.

---

2. The parties offer conflicting figures regarding the precise number of parcels located in the Eastern Loop section of the Northern Beltway. Plaintiffs assert 1,929 parcels lie within the Eastern Loop; NCDOT avers there are 1,808 parcels within this area.

23 C.F.R. § 710.503(c) (2011). Six of the eight Plaintiffs in the instant case have not applied for administrative relief under the Hardship Program.[3] Second, landowners may apply for a building permit or subdivision plat approval, in which case the Map Act's restrictions on development are lifted a maximum of three years after the application is submitted. N.C. Gen. Stat. § 136-44.51(b) (2011). Plaintiffs have not applied for building permits or subdivision plat approvals. Third, landowners may request a variance from the Map Act's restrictions. N.C. Gen. Stat. § 136-44.52 (2011). Variances are granted where "no reasonable return may be earned from the land" and the Map Act's restrictions "result in practical difficulties or unnecessary hardships." *Id.* Plaintiffs have not applied for variances. In addition to these administrative remedies, the Map Act provides an 80 percent property tax reduction to qualifying landowners.[4] N.C. Gen. Stat. § 105-277.9 (2011).

NCDOT began acquiring properties in the Western Loop through its Hardship Program soon after recording the map of reservation for that section of the Northern Beltway Project. However, NCDOT's plans for property acquisition and development were postponed in 1999 when a coalition of citizens and owners of property within the corridor brought suit in the United States District Court for the Middle District of North Carolina and obtained an injunction prohibiting NCDOT from further acquisition and development of the Western Loop. *See generally N.C. Alliance for Transp. Reform, Inc. v. United States DOT*, 713 F. Supp. 2d 491 (M.D.N.C. 2010). The court lifted the injunction in May 2010, *id.* at 527, and NCDOT has since resumed acquisition of properties in both the Western and Eastern Loop sections of the Northern Beltway through its Hardship Program. While it is unclear precisely how many parcels NCDOT has purchased within the Northern Beltway to date, NCDOT describes the number as "over 300" as of 21 March 2011.[5]

---

3. Plaintiffs Beroth Oil Company and N&G Properties, Inc. are the only Plaintiffs that have applied for early acquisition of their properties pursuant to NCDOT's Hardship Program. NCDOT has denied their applications for relief in each instance.

4. Property situated within the protected corridor "is taxable at twenty percent (20%) of its appraised value if . . . no building or other structure is located on the property[, and] [t]he property has not been subdivided . . . since it was included in the corridor." N.C. Gen. Stat. § 105-277.9 (2011).

5. At oral arguments on 8 February 2012, Plaintiffs alleged that NCDOT has acquired 41 additional properties since the filing of this suit. Plaintiffs further alleged that if NCDOT continues acquisition at its current rate, it would be another 31 years before NCDOT purchases all parcels in the Northern Beltway.

On 16 September 2010, Plaintiffs filed a complaint in Forsyth County Superior Court setting forth the following allegations regarding the Map Act and NCDOT's actions pursuant to the Map Act in furtherance of its plan to develop the Northern Beltway:

> The inordinate 13 years[6] and counting delay by NCDOT in acquiring Plaintiffs' property in the Western Loop, the filing of the Western Loop and Eastern Loop maps with the Forsyth County Register of Deeds, the restrictions on property imposed by [the Map Act], the existence of the Hardship Program, the statements of the NCDOT to Plaintiffs and Other Property Owners regarding the use of their properties, the statements of NCDOT that acquisitions in the Northern Beltway will not commence for an undetermined number of years, the expressed intent of NCDOT to depress future property values and development in the Northern Beltway, the acquisition of dozens of parcels in the Northern Beltway by NCDOT, NCDOT's demolition of homes in the Northern Beltway, the condemnation blight caused by NCDOT, and NCDOT's continued acquisition of property in the Northern Beltway subsequent to May 2010, are unequivocal, fixed and irreversible indications that NCDOT intends to purchase the Plaintiffs' Properties and Other Property Owners' properties at some future undisclosed time.

Plaintiffs further alleged that these acts "have placed a cloud upon all real property in the Northern Beltway" and "have rendered the Plaintiffs' Properties and Other Property Owners' real properties in the Northern Beltway unmarketable at fair market value, economically undevelopable, and depressed property values and rents throughout the Northern Beltway."

Based on the foregoing allegations, Plaintiffs' complaint set forth the following claims for relief against NCDOT: inverse condemnation pursuant to N.C. Gen. Stat. § 136-111 (2011) ("Claim 1"); a taking in violation of the Fifth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 ("Claim 2"); a violation of Plaintiffs' rights under the equal protection clause of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 ("Claim 3"); a taking in violation of Article I, Section 19 (the

---

6. As of the filing of this opinion, approximately 14 years and 7 months have passed since NCDOT filed its map of reservation for the Western Loop section of the Northern Beltway Project.

"Law of the Land" clause) of the North Carolina Constitution ("Claim 4"); and declaratory relief pursuant to N.C. Gen. Stat. § 1-260 (2011) seeking "a declaration of taking and the date of the taking[,]" or, in the alternative, "a declaration that the Hardship Program, and [the Map Act] are unconstitutional and invalid exercises of legislative power as they affect a taking by the NCDOT without just compensation and are unequal in their application to property owners" ("Claim 5"). Plaintiffs alleged these claims individually and on behalf of members of the following proposed class: "Plaintiffs and all others similarly situated who own property in the Northern Beltway in Forsyth County and are subject to [the Map Act]." Plaintiffs further alleged the proposed class members share a "genuine personal interest" in the action because they each own property subject to the Map Act's restrictions and "will continue to be damaged and injured if NCDOT is not compelled to purchase all property located in the Northern Beltway."

On 18 March 2011, Plaintiffs filed a motion for certification of the proposed class. Plaintiffs described a proposed class consisting of at least 800 members, identifiable through tax records and the maps of reservation recorded in furtherance of the Northern Beltway Project. Plaintiffs proposed bifurcated proceedings through which the class would seek to prove their common injury in the first phase of the action, and then class members would seek to prove their damages individually in the second phase. Plaintiffs also filed affidavits on behalf of each of the proposed class representatives in support of their motion for certification.

On 18 November 2010, NCDOT filed an answer and motion to dismiss Plaintiffs' claims pursuant to Rules 12(b)(1), (2), and (6) of the North Carolina Rules of Civil Procedure and raised the defense of sovereign immunity. NCDOT also filed a memorandum of law in support of its motion to dismiss and in opposition to Plaintiffs' motion for class certification with accompanying affidavits on 28 March 2011.

By order entered 19 April 2011, the trial court granted NCDOT's motion to dismiss Plaintiffs' Fifth Amendment taking claim (Claim 2); Plaintiffs' Fourteenth Amendment equal protection claim (Claim 3); Plaintiffs' taking claim under the North Carolina Constitution (Claim 4); and the portion of Plaintiffs' declaratory judgment claim seeking a declaration of a taking of their property and the date of the taking (first part of Claim 5). The trial court denied NCDOT's motion to dismiss Plaintiffs' inverse condemnation claim (Claim 1), and "that part of [Plaintiffs' declaratory judgment claim] seeking a declaration of unconstitutionality of [the Map Act]" (the second part of Claim 5).

Neither party has appealed from the trial court's 19 April 2011 order. Remaining to be heard before the trial court, therefore, are Plaintiffs' inverse condemnation claim pursuant to N.C. Gen. Stat. § 136-111 and Plaintiffs' declaratory judgment claim challenging the constitutionality of the Map Act.

On 20 May 2011, the trial court entered a separate order denying Plaintiffs' motion for class certification of their inverse condemnation claim. In its order, the trial court applied "ends-means" analysis and determined that Plaintiffs had failed to establish the existence of a "class" because the question of whether a taking had occurred with respect to each of the affected properties predominated over questions of law and fact common to all members of the proposed class. *See* discussion, *infra*, Part III(C)(1)(a)-(b). The trial court further concluded that even if Plaintiffs had established a class, the class action mechanism is not the superior method of adjudicating the claims at issue because "whether a taking has occurred must be determined on a property-by-property basis" and, therefore, "[n]one of the savings and expediencies that a class action offers would be realized." Plaintiffs timely filed notice of appeal from the trial court's 20 May 2011 order on 22 June 2011.

## II. Jurisdiction

[1] At the outset, we note Plaintiffs' appeal is interlocutory, as the trial court's order denying Plaintiffs' motion for class certification was not a final disposition of Plaintiffs' claims. *Frost v. Mazda Motor of Am., Inc.*, 353 N.C. 188, 192, 540 S.E.2d 324, 327 (2000) ("A class certification order is not a final judgment disposing of the cause as to all parties; the appeal of such orders is thus interlocutory."); *see also Flitt v. Flitt*, 149 N.C. App. 475, 477, 561 S.E.2d 511, 513 (2002) ("An order is interlocutory if it is made during the pendency of an action and does not dispose of the case but requires further action by the trial court in order to finally determine the rights of all the parties involved in the controversy."). Generally, an interlocutory order is not immediately appealable. *See* N.C. Gen. Stat. § 1A-1, Rule 54(b) (2011). An exception lies, however, where the order appealed from "affects a substantial right." N.C. Gen. Stat. § 1-277(a) (2011) ("An appeal may be taken from every judicial order or determination of a judge of a superior or district court . . . which affects a substantial right claimed in any action or proceeding[.]"); *see also* N.C. Gen. Stat. 7A-27(d)(1) (2011). "The *denial* of class certification has been held to affect a substantial right because it determines the action as to the unnamed plaintiffs." *Frost*, 353 N.C. at 193, 540 S.E.2d at 327. We adopt this rea-

soning in the instant case, and we now address the merits of Plaintiffs' appeal.

## III. Analysis

[2] The sole issue presented on appeal is whether the trial court erred in denying Plaintiffs' motion for class certification of their inverse condemnation claim. Plaintiffs contend the trial court mistakenly applied the ends-means test in determining individual issues would predominate over common issues at a trial on the merits of Plaintiffs' inverse condemnation claim and that this error led to the court's erroneous conclusion that Plaintiffs had failed to prove the existence of a class. Plaintiffs further contend that even if the trial court did not err in employing ends-means analysis, the trial court erred in determining individual issues would predominate. Plaintiffs also contend the trial court's order results in unequal treatment for similarly situated property owners. Finally, Plaintiffs contend the class action mechanism represents the superior method for adjudicating their claims, as the Map Act and NCDOT's conduct taken pursuant thereto have adversely affected all members of the proposed class, and a class action would alleviate the need for individual adjudications of their common claims. After careful examination of these arguments, we hold the trial court did not abuse its discretion, and we affirm the trial court's 20 May 2011 order denying Plaintiffs' motion for class certification.

## A. Standard of Review

"The trial court has broad discretion in determining whether a case should proceed as a class action." *Faulkenbury v. Teachers' & State Employees' Ret. Sys. of N.C.*, 345 N.C. 683, 699, 483 S.E.2d 422, 432 (1997). We review the trial court's decision to deny class certification for abuse of discretion. *Peverall v. County of Alamance*, 184 N.C. App. 88, 91, 645 S.E.2d 416, 419 (2007); *Nobles v. First Carolina Communications, Inc.*, 108 N.C. App. 127, 132, 423 S.E.2d 312, 315 (1992). "Under an abuse of discretion standard, we defer to the trial court's discretion and will reverse its decision 'only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.'" *Gibbs v. Mayo*, 162 N.C. App. 549, 561, 591 S.E.2d 905, 913 (2004) (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)); *see also Harrison v. Wal-Mart Stores, Inc.*, 170 N.C. App. 545, 547, 613 S.E.2d 322, 325 (2005) ("The trial court's decision constitutes an abuse of discretion where it is 'manifestly unsupported by reason, or so arbitrary that it could not have been the result of a

reasoned decision[.]' " (quoting *Frost,* 353 N.C. at 199, 540 S.E.2d at 331) (alteration in original)). Abuse of discretion occurs in the context of class certification " 'when (1) [the trial court's] decision [to deny class certification] rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding— cannot be located within the range of permissible decisions.' " *Blitz v. Agean, Inc.,* 197 N.C. App. 296, 300, 677 S.E.2d 1, 4 (2009) (citation omitted) (ellipsis in original).

In determining whether the trial court exceeded the broad discretion accorded to it under the abuse of discretion standard, we review issues of law *de novo. Id.* "Under a *de novo* review, [this Court] considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re Appeal of Greens of Pine Glen Ltd.,* 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003). Thus, while we afford significant deference to the trial court's ruling under the abuse of discretion standard, we review *de novo* the trial court's " ' "conclusions of law that informed its decision to deny class certification." ' " *Blitz,* 197 N.C. App. at 300, 677 S.E.2d at 4 (citations omitted). After conducting a *de novo* review of "the law underpinning the trial court's denial of class certification, we [then] turn to the specific facts of the instant case to determine if denial of class certification was proper." *Id.* at 310, 677 S.E.2d at 10. The trial court's findings of fact are binding on appeal if supported by competent evidence. *Nobles,* 108 N.C. App. at 132, 423 S.E.2d at 315.

## B. Class Certification

Section 1A-1, Rule 23(a) of our General Statutes sets forth North Carolina's class action rule: "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued." N.C. R. Civ. P. 23(a). The class action mechanism seeks to eliminate " 'repetitious litigation and possible inconsistent adjudications involving common questions, related events, or requests for similar relief.' " *English v. Holden Beach Realty Corp.,* 41 N.C. App. 1, 9, 254 S.E.2d 223, 230–31 (1979) (citation omitted), *overruled on other grounds by Crow v. Citicorp Acceptance Co.,* 319 N.C. 274, 354 S.E.2d 459 (1987). Rule 23 "is based on [its] federal counterpart [] as it existed prior to 1966, when North Carolina adopted a modified version of the Federal Rules of Civil Procedure for state proceedings." *Ehrenhaus v. Baker,* ___ N.C. App. ___ , ___ , 717 S.E.2d 9, 17 (2011) (citing *Crow,* 319 N.C. at

277-80, 354 S.E.2d at 463-64). Amendments to Federal Rule 23 have distinguished it from North Carolina's Rule 23; nonetheless, "the case law interpreting [Federal Rule 23] is extensive[,]" and although " 'federal cases are not binding on [North Carolina Courts,] we have held in the past that the reasoning in such cases can be instructive.' " *Id.* (citation omitted) (third alteration in original).

"The party seeking to bring a class action under Rule 23(a) has the burden of showing that the prerequisites to utilizing the class action procedure are present." *Crow,* 319 N.C. at 282, 354 S.E.2d at 465 (footnote omitted). Our Supreme Court has articulated the prerequisites for class certification as follows:

> "[A] 'class' exists under Rule 23 when the named and unnamed members each have an interest in either the same issue of law or of fact, and that issue predominates over issues affecting only individual class members." Other prerequisites for bringing a class action are that (1) the named representatives must establish that they will fairly and adequately represent the interests of all members of the class; (2) there must be no conflict of interest between the named representatives and members of the class; (3) the named representatives must have a genuine personal interest, not a mere technical interest, in the outcome of the case; (4) class representatives within this jurisdiction will adequately represent members outside the state; (5) class members are so numerous that it is impractical to bring them all before the court; and (6) adequate notice must be given to all members of the class.

*Faulkenbury,* 345 N.C. at 697, 483 S.E.2d at 431 (quoting *Crow,* 319 N.C. at 280, 354 S.E.2d at 464) (internal citation omitted). "Where all the prerequisites are met, it is within the trial court's discretion to determine whether 'a class action is superior to other available methods for the adjudication of th[e] controversy.' " *Harrison,* 170 N.C. App. at 548, 613 S.E.2d at 326 (quoting *Crow,* 319 N.C. at 284, 354 S.E.2d at 466) (alteration in original). "Class actions should be permitted where they are likely to serve useful purposes such as preventing a multiplicity of suits or inconsistent results. The usefulness of the class action device must be balanced, however, against inefficiency or other drawbacks." *Crow,* 319 N.C. at 284, 354 S.E.2d at 466. "Among the matters and drawbacks the trial court may consider in its discretion involving class certification are matters of equity." *Blitz,* 197 N.C. App. at 301, 677 S.E.2d at 5 (citing *Maffei v. Alert Cable TV, Inc.,* 316 N.C. 615, 621, 342 S.E.2d 867, 872 (1986)). "[T]he trial court

has broad discretion in this regard and is not limited to consideration of matters expressly set forth in Rule 23 . . . ." *Crow*, 319 N.C. at 284, 354 S.E.2d at 466.

## C. Plaintiffs' Appeal

The trial court denied Plaintiff's motion for class certification on grounds that Plaintiffs failed to prove the existence of a class. Specifically, the trial court determined Plaintiffs failed to bring forth a class because "[c]ommon issues of fact and law would not predominate" in a trial on the merits of Plaintiffs' inverse condemnation claim. Although not required to determine whether a class action represented the superior method of adjudication,[7] the trial court concluded that even if Plaintiffs had established the existence of a class, the class action mechanism would not provide the superior method for adjudication here due to the individualized nature of Plaintiffs' claims. The trial court also determined that Plaintiffs met their burden with respect to the remaining prerequisites regarding the adequacy of the class representatives and the numerosity requirement, and NCDOT has not challenged these conclusions on appeal.[8] The issue presented, therefore, is whether the trial court erred in concluding Plaintiffs failed to establish a class and, if so, whether the trial court abused its discretion in determining the matter not suitable for class adjudication.

### 1. Existence of a Class

Plaintiffs and all members of the proposed class appear connected by their common plight. The proposed class consists of individuals who own property within the Northern Beltway and are subject to the Map Act's restrictions. The Map Act precludes these landowners from obtaining permits to develop and increase the value of their property. The looming threat of condemnation poses a significant obstacle if they attempt to sell their property. These individuals either do not qualify for the Hardship Program, or they do qualify, but are subject to administrative discretion regarding the price at which

---

7. Representing the final hurdle to class certification, the issue of whether a class action is the superior method of adjudication arises only when the party seeking class certification has established all of the prerequisites for class certification. *Crow*, 319 N.C. at 284, 354 S.E.2d at 466.

8. N.C. R. App. P. 28(c) permits an appellee to "present issues on appeal based on any action or omission of the trial court that deprived the appellee of an alternative basis in law for supporting the judgment, order, or other determination from which appeal has been taken."

NCDOT is willing to purchase their property. The mere existence of the Hardship Program indicates our Legislature's tacit acknowledgment that the Map Act adversely affects the property rights of at least some of these landowners. Moreover, any appraisal of property within the corridor—for purposes of private sale or for NCDOT's acquisition under the Hardship Program—will reflect the phenomenon of "condemnation blight" in the surrounding area alleged by Plaintiffs.[9]

Plaintiffs and all owners of real property located within the corridor have sustained the effects of government action. Whether this action constitutes a taking, however, is not the question before this Court, and we express no opinion on this issue. Rather, we must determine only whether the particular issues of law and fact to be resolved in a trial on the merits of Plaintiffs' inverse condemnation claim render the class action mechanism the proper mechanism for adjudication. In order to prove that a class action would best serve the interests of all members of the proposed class, Plaintiffs were required to demonstrate the existence of a class. As previously stated, "a 'class exists' under Rule 23 when the named and unnamed members each have an interest in either the same issue of law or of fact, and that issue predominates over issues affecting only individual class members." *Id.* at 280, 354 S.E.2d at 464. Plaintiffs contend a class exists and that the trial court's failure to reach this conclusion was the product of two errors: (1) the trial court's decision to employ ends-means analysis in examining Plaintiffs' takings claim; and (2) the trial court's conclusion that individual issues would predominate in a trial on the merits. We address these arguments in turn.

### a. The Trial Court's Reliance Upon Ends-Means Analysis

The trial court engaged in the following analysis in determining individual issues predominate over common issues and, accordingly, Plaintiffs had failed to establish the existence of a class:

---

9. " 'Condemnation blight' is a reduction in the value of condemned property that results due to the prospect of eminent domain and occurs between the time that the property is first considered for public acquisition and prior to the date of actual taking." *Nichols on Eminent Domain*, Vol. 8A, § 18.01 (2011). Here, Plaintiffs have alleged, *inter alia*, that NCDOT has purchased properties within the corridor and has not maintained these properties to the standards of other property owners within the corridor. Plaintiffs further allege that NCDOT rents these properties at less than fair market value, which has depressed rental rates for Plaintiffs and other property owners within the corridor. As the parties in the instant case acknowledge, condemnation blight is not judicially recognized in North Carolina.

The [Map Act] contains no expression of its purpose, but there can be no reasonable dispute that at least one purpose of [the Map Act] is to protect against development of properties within the corridor which would increase the amount of which the NCDOT would be required to pay for future acquisitions. That protection of the public purse is a valid reason for exercising police power is hardly arguable. It is another question, however, whether such restrictions are "reasonable." Assuming arguendo, that they are, the second inquiry, whether the interference with the owner's rights amounts to a taking, depends on whether the interference renders the use of the property impractical and the property itself of no reasonable value.

This determination would have to be made with respect to each property within the Northern Beltway. Some of those properties are improved and some are not. Some are residential and others are commercial. How the statutory restrictions affect each property will be different because each property is different. The taking question is different from computation of damages after a taking, and cases holding that differences in the amount of damages, alone, should not affect whether a class should be certified are inapposite. Common issues of fact and law would not predominate. Consequently, the plaintiffs have not defined a "class."

(Footnote and internal citation omitted).

Plaintiffs contend the trial court's reliance upon "ends-means" analysis in concluding individual issues would predominate over common issues was error, as this analysis applies only in instances where the alleged taking arises out of the State's exercise of its police power and, more specifically, only in the context of zoning regulation-based takings. Plaintiffs argue the trial court's "misapprehension of the law" in this respect was an abuse of discretion requiring remand to the trial court with instructions to apply the correct, "traditional" takings analysis. This Court has previously held a trial court's misapprehension of the law in denying class certification to constitute abuse of discretion. *Blitz*, 197 N.C. App. at 312, 677 S.E.2d at 11; *see also Nationwide Mutual Ins. Co. v. Chantos*, 298 N.C. 246, 252, 258 S.E.2d 334, 338 (1979) ("Where a ruling is based upon a misapprehension of the applicable law, the cause will be remanded in order that the matter may be considered in its true legal light."). For the reasons set out below, however, we hold the trial court did not err in relying upon ends-means analysis in the instant case.

Section 136-111 of our General Statutes serves as the basis for Plaintiffs' inverse condemnation claim and provides, in pertinent part:

> Any person whose land or compensable interest therein has been taken by an intentional or unintentional act or omission of [NCDOT] and no complaint and declaration of taking has been filed by [NCDOT] may . . . file a complaint in the superior court . . . alleg[ing] with particularity the facts which constitute said taking together with the dates that they allegedly occurred; said complaint shall describe the property allegedly owned by said parties and shall describe the area and interests allegedly taken.

N.C. Gen. Stat. § 136-111 (2011). "Inverse condemnation is simply a device to force a governmental body to exercise its power of condemnation, even though it may have no desire to do so." *Smith v. City of Charlotte*, 79 N.C. App. 517, 521, 339 S.E.2d 844, 847 (1986). "An action in inverse condemnation must show (1) a taking (2) of private property (3) for a public use or purpose." *Adams Outdoor Adver. of Charlotte v. N.C. Dep't of Transp.*, 112 N.C. App. 120, 122, 434 S.E.2d 666, 667 (1993). Thus, the question of whether Plaintiffs' properties have been "taken" is central to their inverse condemnation claim. To determine the proper takings analysis—and whether the trial court erred in employing ends-means analysis—we begin with a review of the pertinent takings law.

"The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides, *inter alia,* 'private property [shall not] be taken for public use without just compensation.' " *E. Appraisal Servs., Inc. v. State*, 118 N.C. App. 692, 695, 457 S.E.2d 312, 313 (1995) (citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897)).

> "The word 'property' extends to every aspect of right and interest capable of being enjoyed as such upon which it is practicable to place a money value. The term comprehends not only the thing possessed but also, in strict legal parlance, means the right of the owner to the land; the right to possess, use, enjoy and dispose of it, and the corresponding right to exclude others from its use."

*Long v. City of Charlotte*, 306 N.C. 187, 201, 293 S.E.2d 101, 110 (1982) (citation omitted). The Fifth Amendment's limitation on the eminent domain power prevents government "from forcing some people alone to bear public burdens which, in all fairness and justice,

should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

> [A]lthough the North Carolina Constitution does not contain an express provision prohibiting the taking of private property for public use without payment of just compensation, this Court has inferred such a provision as a fundamental right integral to the 'law of the land' clause in article I, section 19 of our Constitution.

*Finch v. City of Durham*, 325 N.C. 352, 362-63, 384 S.E.2d 8, 14 (1989) (citing *Long*, 306 N.C. at 196, 293 S.E.2d at 107-08). Article I, section 19 of the North Carolina Constitution provides that "[n]o person shall be . . . in any manner deprived of his . . . property, but by the law of the land." N.C. Const. Art. 1, § 19. Indeed, our Supreme Court has described this fundamental right " 'as so grounded in natural law and justice that it is part of the fundamental law of this State, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken.' " *Chapel Hill Title & Abstract Co., Inc. v. Town of Chapel Hill*, 362 N.C. 649, 654, 669 S.E.2d 286, 289 (2008) (quoting *Long*, 306 N.C. at 196, 293 S.E.2d at 107-08).

In determining whether State action amounts to a taking, our Courts have employed different analyses depending upon the context in which the alleged taking occurs. "A taking does not occur simply because government action deprives an owner of previously available property rights." *Finch*, 325 N.C. at 366, 384 S.E.2d at 16 (citing *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 130 (1978)). " 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every change in the general law.' " *Id.* (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). Where government action results in physical invasion of private property, the analysis focuses on the extent to which the government action interferes with the affected property owner's property rights. *Long*, 306 N.C. at 199, 293 S.E.2d at 109. These rights include "the right to possess, use, enjoy, and dispose of [the property], and the corresponding right to exclude others from its use." *Id.* at 201, 293 S.E.2d at 110. A taking occurs in this context if the government action amounts to "a substantial interference with elemental rights growing out of the ownership of property." *Id.* at 199, 293 S.E.2d at 109. In contrast, where the taking allegation arises out of State regulation, our Courts employ "ends-means" analysis in determining

whether the regulation at issue exceeds the scope of the State's police power, thereby resulting in a taking of the affected property:

> The test for a reasonable exercise of a police power rule or regulation is known as the "ends-means" test. In evaluating the regulation's effect, one first looks to the 'ends,' or goals, of the legislation to determine whether it is within the scope of the police power, and second, to the 'means,' to determine whether the interference with the owner's right to use his property as he deems appropriate is reasonable. A failure in either 'ends' or 'means' results in a taking.

> Within the second prong of the 'takings' analysis, the 'reasonable means' prong, a statute works a 'taking' of property if it (1) deprives the owner of all practical use of the property and (2) renders the property of no reasonable value. Mere restriction of 'practical uses' or diminishment of 'reasonable value' does not result in a 'taking.'

*Weeks v. N.C. Dep't of Natural Res. & Cmty. Dev.*, 97 N.C. App. 215, 225, 388 S.E.2d 228, 234 (1990) (internal citations omitted).

Here, NCDOT's actions are regulatory in nature. NCDOT has filed maps of reservation to prevent further development of Northern Beltway property intended for future condemnation and development. While NCDOT possesses eminent domain power, it has not yet exercised that power. NCDOT's acquisition of properties through its Hardship Program is not an exercise of eminent domain power, but rather an attempt to mitigate the negative impact of the Map Act's restrictions on some of the affected property owners.[10]

Plaintiffs analogize this case to *Long and Dep't of Transportation v. Harkey*, 308 N.C. 148, 301 S.E.2d 64 (1983), in arguing the trial court was required to apply traditional eminent domain analysis, *i.e.*, whether NCDOT's conduct has substantially interfered with Plaintiffs' property rights resulting in a taking. *See Long*, 306 N.C. at 201, 293 S.E.2d at 110. Plaintiffs' reliance on these cases is misplaced, however, as both *Long* and *Harkey* involved instances of physical intrusion, *see id.* at 191, 293 S.E.2d at 105 (airplane flights overhead emitted noise and pollutants depressing the value of the plaintiffs' property); *Harkey*, 308 N.C. at 149, 301 S.E.2d at 65 (NCDOT project physically blocked property owners' access to abutting high-

---

10. We note NCDOT also acquires properties where the acquisition is in the best interest of preserving the corridor. N.C. Gen. Stat. § 136-44.53(a) (2011). This explains NCDOT's purchase of the Vienna Baptist Church for $1.6 million in August 2010.

way). The trial court recognized this distinction and analogized this case to "regulatory takings" cases, like *Finch*, that involve development limitations and variances similar to the restrictions imposed by the Map Act. The trial court applied ends-means analysis on this basis. Contrary to Plaintiffs' assertion, this Court has previously employed ends-means analysis outside the context of zoning regulation-based takings. *See, e.g., E. Appraisal Servs., Inc.*, 118 N.C. App. at 696, 457 S.E.2d at 314 (specifically holding ends-means analysis applicable outside the context of zoning regulations); *Weeks*, 97 N.C. App. at 225, 388 S.E.2d at 234 (citing *Finch* for proposition that "[t]he test for a reasonable exercise of a police power rule or regulation is known as the 'ends-means' test" and employing ends-means analysis in holding Coastal Resource Commission's denial of landowner's application to build pier on his property was not a taking); *King v. State*, 125 N.C. App. 379, 385-86, 481 S.E.2d 330, 334 (1997) (citing *Finch* in holding no taking had occurred because landowner had not been deprived of all practical use and reasonable value of her property). Our application of ends-means analysis in these cases demonstrates the broad applicability of ends-means analysis and reinforces our conclusion that the trial court did not err in employing ends-means analysis here.

Plaintiffs contend the trial court's reliance on ends-means analysis was error because NCDOT has exercised its eminent domain power, not its police power. Plaintiffs insist that the ends-means test applies only in examining State regulation under its police power, while the "substantial interference" test applies where the State has taken and condemned properties through its eminent domain power. This argument is misguided.

In *Barnes v. N.C. State Highway Comm'n*, our Supreme Court described the relationship between the police power and the eminent domain power as follows:

The question of what constitutes a taking is often interwoven with the question of whether a particular act is an exercise of the police power or of the power of eminent domain. If the act is a proper exercise of the police power, the constitutional provision that private property shall not be taken for public use, unless compensation is made, is not applicable. The state must compensate for property rights taken by eminent domain; damages resulting from the exercise of police power are noncompensable.

257 N.C. 507, 514, 126 S.E.2d 732, 737-38 (1962) (citations and quotation marks omitted).

Plaintiffs are correct in stating that police power and eminent domain power are analyzed in different terms: just compensation is required when the government flexes its eminent domain power; on the other hand, no compensation is required where the government acts within the boundaries of its police power. *See id.* Plaintiffs' argument is flawed, however, in that it assumes one analysis—the ends-means test—applies in examining police power regulation and a separate analysis—the "substantial interference" test—applies in examining the State's exercise of its eminent domain power. This is not the case. It is not the police power/eminent domain distinction that determines the applicable test; rather, it is the applicable test that determines whether the State action is an exercise of police power or eminent domain power. The applicable test, as described above, depends upon whether the State action is physically intruding upon, or merely regulating, the affected property.

To further clarify this point: "Police power" is a broad and general term that encompasses the State's power to act for the safety, health, and general welfare of its citizens. *See Finch,* 325 N.C. at 363, 384 S.E.2d at 14. Included under this umbrella of State police power is the State's eminent domain power. In the context of a regulatory taking, the relationship between police power and eminent domain power can be described as a continuum: where State regulation under its police power "goes too far," the State is, in essence, exercising its eminent domain power. *See Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014 (1992) (quoting *Pennsylvania Coal Co.,* 260 U.S. at 415, for the proposition that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking"). The purpose of employing the ends-means test is to determine whether the regulation at issue is a legitimate exercise of State police power, or, whether the "regulation" is in substance an exercise of eminent domain power requiring just compensation. In other words, the ends-means test is a tool used by the courts to determine whether the state has exercised its police power or its eminent domain power. The question whether NCDOT has exercised its police power versus its eminent domain power in the instant case is tantamount to asking whether NCDOT has effected a taking of Plaintiffs' property. As the merits of Plaintiffs' claims are not before this Court, we express no opinion on this issue.

In sum, the distinguishing element in determining the proper takings analysis is not whether police power or eminent domain power is at issue, but whether the government act physically interferes with or merely regulates the affected property. The trial court correctly relied upon the ends-means test in the instant case, as the alleged taking is regulatory in nature and as we have specifically held this analysis applicable outside the context of zoning-based regulatory takings. We accordingly hold the trial court did not err in relying upon ends-means analysis in examining Plaintiffs' inverse condemnation claim.

### b. *Individual Issues Predominate*

Having determined that the trial court did not err in employing ends-means analysis, we now address whether the trial court applied this analysis correctly. Specifically, we must determine whether the trial court erred in concluding individual issues would predominate over common issues of law and fact in a trial on the merits of Plaintiffs' inverse condemnation claim. For the reasons that follow, we hold the trial court did not abuse its discretion in reaching this conclusion.

The party seeking class adjudication bears the burden of proving that each of the prerequisites for class certification is met. *Blitz*, 197 N.C. App. at 302, 677 S.E.2d at 5. Plaintiffs were required to prove before the trial court, *inter alia*, that a class exists, by showing that in litigating their claims issues of law and fact common to all prospective class members would predominate over issues of law and questions of fact unique to individual members of the proposed class. *See Faulkenbury*, 345 N.C. at 697, 483 S.E.2d at 431. This Court has described the predominance requirement as "the primary issue" upon which courts from other jurisdictions have based their decisions in ruling on motions for class certification. *Blitz*, 197 N.C. App. at 303, 677 S.E.2d at 6. The trial court is justified in denying the motion where the party seeking class certification fails to meet this requirement. *See, e.g., Harrison*, 170 N.C. App. at 552, 613 S.E.2d at 328 (holding individual factual inquiries regarding contract formation among prospective plaintiffs predominated in breach of contract claim against employer). A variation in damages among the prospective plaintiffs is not a bar to class certification. *Faulkenbury*, 345 N.C. at 698, 483 S.E.2d at 432 (describing differences in amounts of recovery among class members as a "collateral issue"); *but see Perry v. Cullipher*, 69 N.C. App. 761, 763, 318 S.E.2d 354, 356 (1984) (holding no abuse of discretion in the trial court's denial of class certification where the damages might vary greatly among the parties).

Here, in order to prevail on their inverse condemnation claim, Plaintiffs must prove that NCDOT's conduct has resulted in a taking of their property. *See* N.C. Gen. Stat. § 136-111 (2011). The property interest at issue is in the nature of an easement right: Plaintiffs have relinquished their right to develop their property without restriction. *See Strickland v. Shew*, 261 N.C. 82, 85, 134 S.E.2d 137, 140 (1964) ("The grantor [of an easement right] is obligated to refrain from doing, or permitting anything to be done, which results in the impairment of the easement."). The alleged taking has occurred through a regulatory proceeding, and NCDOT has waited more than a decade to compensate Plaintiffs for their relinquished easement right. NCDOT possesses the authority to condemn Plaintiffs' property and has manifested its intent to do so, but has not yet exercised this power due to what it describes as funding constraints. The question of whether NCDOT's actions amount to a taking is a question of law common to all properties located within the protected corridor. *See Mattoon v. City of Norman*, 633 P.2d 735, 740 (Okl. 1981). Because each individual parcel of land is unique, however, and because the owner's expectations and interests in their individual properties vary, we must conclude that individual issues of fact will predominate in resolving Plaintiffs' inverse condemnation claim.

It is a well-known principle that land is unique. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 461 (1988); *Powell v. City of Newton*, 364 N.C. 562, 573-74, 703 S.E.2d 723, 731 (2010) (Hudson, J., dissenting), *reh'g denied*, ___ N.C. ___, 706 S.E.2d 241 (2011). In a trial on the merits, Plaintiffs must demonstrate (1) they have been deprived of all practical use of their property and (2) the property has been deprived of all reasonable value in order to prove their property has been taken. *See supra*, Part III(C)(1)(a); *Weeks*, 97 N.C. App. at 225, 388 S.E.2d at 234. Due to the unique nature of each individual parcel of land, and each individual property owner's interest in and expectations relating to that particular parcel, these determinations cannot be applied to the class in a general, broad-brush manner. What might constitute a taking as to one parcel of land might not constitute a taking as to others, depending on the characteristics of the land and the purpose for which the land is being used. NCDOT's actions in filing the corridor maps and acquiring properties through its Hardship Program may or may not qualify as a taking depending on a myriad of individualized evidentiary factors. While the Map Act's restrictions may be common to all prospective class members, liability can be established only after extensive examina-

BEROTH OIL CO. v. N.C. DEP'T of TRANSP.

[220 N.C. App. 419 (2012)]

tion of the circumstances surrounding each of the affected properties. Whether a particular property owner has been deprived of all practical use of his property and whether the property has been deprived of all reasonable value require case-by-case, fact-specific examinations regarding the affected property owner's interests and expectations with respect to his or her particular property.

This Court cannot know the extent of the disparity among the affected property owners in terms of their various property-related interests and expectations. The record before this Court does not provide all of the necessary information. We can determine from the record and from the trial court's findings, however, that such a disparity exists. The trial court found that some of the affected properties are improved and some are not; that some of the properties are used for residential purposes and others are used for commercial purposes. Competent evidence supports these findings and, indeed, Plaintiffs themselves highlight the diversity among the estimated 850 prospective class members in advocating for class certification. It is possible that some of these property owners have no desire to develop their property; others may intend to move out of the Northern Beltway area for reasons unrelated to NCDOT's conduct and the Map Act's restrictions. The information in the record before us is insufficient to make these determinations.

A trial on the merits will require separate inquiries into each property owner's use and expectations regarding his or her property. The court below relied upon this truth in determining that individual factual issues predominate and, accordingly, Plaintiffs had failed to establish a class. It was Plaintiffs' burden to introduce an effective methodology for bringing their claims together as a class. Within its discretion, the trial court concluded that Plaintiffs failed to meet this burden, and that Plaintiffs' inverse condemnation claim was not manageable as a class action. Because we discern no abuse of discretion in the trial court's determinations underlying its decision to deny Plaintiffs' motion for class certification, we must defer to the trial court's ruling.

The decisions of the highest courts in other jurisdictions support our conclusion that individual factual issues will predominate in resolving Plaintiffs' inverse condemnation claim. In *Basurco v. 21st Century Ins. Co.*, a California appellate court, quoting an earlier ruling by the California Supreme Court in *City of San Jose v. Superior Court*, 525 P.2d 701, 711 (Cal. 1974), stated the following

in upholding the trial court's denial of the plaintiffs' motion for class certification of their inverse condemnation claim:

> "[T]he [class action] scheme is incompatible with the funda-mental maxim that each parcel of land is unique . . . . Although this rule was created at common law, the very factors giving it vitality in the simple days of its genesis take on added signifi-cance in this modern era of development. Simply stated, there are now more characteristics and criteria by which each piece of land differs from every other.
>
> We decline to alter this rule of substantive law to make class actions more available. Class actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends—to sacrifice the goal for the going." Here, "[n]o one factor . . . will be determinative as to all parcels," and "each parcel of land is unique."

108 Cal. App. 4th 110, 120, 133 Cal. Rptr. 2d 367, 374 (2003) (citations omitted) (alterations in original).

In *Mattoon*, the Oklahoma Supreme Court squarely addressed the predominance issue in refusing to certify the plaintiff-landowners' inverse condemnation claim:

> In *Mattoon I*, we stated that the question of fact to be tried here is whether the enactment of the Ordinance did result in such a *substantial* interference with, or impairment of, the use and enjoyment of the affected land that it constitutes a taking. This determination will necessarily call for assessment of the *degree* of interference which is an element implicit in its *sub-stantiality*. It is this inquiry—essential to *every* claim—that may tip the preponderance scales in the direction of individual questions, so as to preclude class action certification.

633 P.2d at 739 (footnote omitted). We believe it noteworthy that the *Mattoon* court applied "substantial interference" analysis—the analy-sis advocated for by Plaintiffs in the instant case, *see supra*, Part III(C)(1)(a)—in denying the plaintiffs request for class certification.

Although not specifically in the context of class certification, the Florida Supreme Court tangentially touched upon the predominance issue in addressing the issue of whether filing a corridor map can amount to a taking:

BEROTH OIL CO. v. N.C. DEP'T of TRANSP.

[220 N.C. App. 419 (2012)]

[T]his Court has generally been unable to develop any "set for-
mula" for determining when "justice and fairness" require that
economic injuries caused by public action be compensated by
the government, rather than remain disproportionately con-
centrated on a few persons. Rather, it has examined the
"taking" question by engaging in essentially ad hoc, factual
inquiries that have identified several factors-such as the eco-
nomic impact of the regulation, its interference with reason-
able investment backed expectations, and the character of the
government action-that have particular significance.

Therefore, we are convinced that the taking issue may only be
determined upon an individualized basis because the various
property owners' interests will be different and will be affected
by the thoroughfare map in a differing manner.

*Palm Beach County v. Wright*, 641 So. 2d 50, 54 (Fla. 1994) (quota-
tion marks and internal citations omitted) (alteration in original).
While we recognize these decisions are not controlling in the case at
bar, *see Morton Bldgs., Inc. v. Tolson*, 172 N.C. App. 119, 127, 615
S.E.2d 906, 912 (2005) ("[D]ecisions from other jurisdictions may be
instructive, [but] they are not binding on the courts of this State."),
we find their reasoning persuasive in reaching our holding here.
Accordingly, we hold the trial court did not abuse its discretion in
concluding individual issues predominate over common issues.

### 2. *Superior Method of Adjudication*

Because we hold the trial court did not err in concluding that
Plaintiffs failed to establish the existence of a class, we need not
reach the question of whether the class action mechanism would be
the superior method for adjudication of this matter. *Crow*, 319 N.C. at
284, 354 S.E.2d at 466 (failure to satisfy any one of the prerequisites
precludes class certification). Although we do not reach this final
prerequisite in the instant case, we find pertinent the Minnesota
Supreme Court's reasoning in *Ario v. Metropolitan Airports
Comm'n*, where the court held the plaintiffs' inverse condemnation
claims unsuitable for class adjudication in light of the plaintiffs' pro-
posed bifurcated proceedings:

Plaintiffs suggest, nevertheless, that after a class action judg-
ment adjudging a substantial invasion of property rights, the
class members might then proceed in 2,000 separate condem-
nation actions to determine their individual damages, and at

that time diminution in market value would be shown. To prove loss of market value, however, each property owner would have to show the nature and extent of the aircraft noise affecting his property's value, after first sifting out the non-noise factors. In other words, much the same proof that was presented in the class action would again be presented in each individual condemnation action. Diminution in market value is so wedded to noise invasion that the former cannot be proved without again proving the latter.

367 N.W.2d 509, 515 (Minn. 1985). Here, analogous to *Ario*, Plaintiffs have proposed bifurcated proceedings through which liability could be determined as to the class, collectively, in the first phase, and the class members could individually bring their damages claims in the second phase of the proceedings. These bifurcated proceedings would require duplication of evidence and would negate many of the benefits of the class action mechanism. Although unnecessary to our holding, we believe utilization of the class action mechanism here would not serve the best interests of the prospective class members, for both practical and equitable reasons.

Moreover, we stress that our holding today has no bearing on Plaintiffs' declaratory judgment claim. Plaintiffs' may still prevail in obtaining a declaration that the Hardship Program and the Map Act "are unconstitutional and invalid exercises of legislative power as they affect a taking by the NCDOT without just compensation and are unequal in their application to property owners," as that claim remains pending before the trial court. Plaintiffs do not need a class to achieve this objective. If the Map Act is declared unconstitutional to one, it is unconstitutional to all. This would afford relief to all members of the proposed class without the need for the class action mechanism.

### 3. *Plaintiffs' Equal Protection Argument*

[3] Finally, we note Plaintiffs' contention that the trial court's order results in unequal treatment for similarly situated property owners. Plaintiffs point out that the ends-means test, the test used by the trial court to determine whether a taking has occurred, employs a standard different from the standard for relief under the Hardship Program. However, the trial court denied class certification only on the basis on Plaintiffs' inverse condemnation claim. The trial court dismissed Plaintiffs equal protection claim in its 19 April 2011 order and the court raised, but did not rule on, Plaintiffs' declaratory judg-

ment claim concerning unequal application of legislative authority under the Map Act. Accordingly, this argument is not properly before this Court, and we decline to reach the merits of Plaintiffs' argument on this issue. We do note, however, that the Hardship Program addresses the proposition that all land is unique, meaning that some property owners within the Northern Beltway will be more adversely affected than others by the Map Act's restrictions. The Hardship Program provides relief to qualified property owners, regardless of whether they have endured a taking of their property in the technical sense.

## IV. Conclusion

For the foregoing reasons, we hold that the trial court's order concluding that Plaintiffs failed to prove the existence of a class "was neither manifestly unsupported by reason nor so arbitrary that it could not have been the result of a reasoned decision." *Harrison*, 170 N.C. App. at 555, 613 S.E.2d at 330 (citing *Frost*, 353 N.C. at 199, 540 S.E.2d at 331). Accordingly, the trial court's 20 May 2011 order denying Plaintiffs' motion for class certification is hereby

Affirmed.

Judges STEELMAN and GEER concur.